# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HOTEL 71 MEZZ LENDER LLC, a Delaware limited liability company; and OAKTREE CAPITAL MANAGEMENT, L.P., a Delaware limited liability company;<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL RETIREMENT FUND,<br><br>Defendant. | Case No. 13-3306<br><br><br>Honorable Ruben Castillo<br><br>Magistrate Judge Brown |
| THE NATIONAL RETIREMENT FUND and THE TRUSTEES OF THE NATIONAL RETIREMENT FUND,<br><br>Counter Claimants,<br><br>v.<br><br>HOTEL 71 MEZZ LENDER LLC, a Delaware limited liability company; OAKTREE CAPITAL MANAGEMENT, L.P., a Delaware limited liability company; and JOHN DOES 1-10 (all other trades or businesses under common control with Chicago H&S Hotel Property, L.L.C.),<br><br>Counter Defendants. | |

**DEFENDANT/COUNTER CLAIMANT'S RESPONSE TO
PLAINTIFFS/COUNTER DEFENDANTS' STATEMENT OF MATERIAL FACTS**

Defendant/Counter Claimant, the National Retirement Fund ("NRF"), through its undersigned attorneys, hereby responds to Plaintiffs/Counter Claimants' Statement of Undisputed Material Facts as follows:

**The Parties**

1. Hotel 71 Mezz Lender LLC is a Delaware limited liability company with its principal place of business in Wilmington, Delaware. (Exhibit 6, Complaint at ¶ 3)

**RESPONSE:** Admitted upon information and belief.

2. Oaktree Capital Management, L.P. is a Delaware limited partnership, with its principal place of business in Los Angeles, CA. (Exhibit 6, Complaint at ¶ 2)

**RESPONSE:** Admitted upon information and belief.

3. The National Retirement Fund, formerly known as UNITE HERE National Retirement Fund, and successor in interest to the HEREIU Pension Fund, is a multiemployer pension fund, jointly administered by trustees representing union entities and employers. (Exhibit 6, Complaint at ¶ 4)

**RESPONSE:** Admitted.

**Jurisdiction and Venue**

4. This Court has original jurisdiction over this matter, pursuant to 28 U.S.C. § 1331 and 1334, because it arises under the Bankruptcy Code and is an action to enforce an order of the Bankruptcy Court. (Exhibit 6, Complaint at ¶ 5)

**RESPONSE:** Admitted.

5. This Court also exercises diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) in that the matter in controversy exceeds the value of $75,000 and is between citizens of different states. (Exhibit 6, Complaint at ¶ 6)

    **RESPONSE:** Admitted.

6.    The United States District Court for the Northern District of Illinois is the proper venue for this case pursuant to 28 U.S.C. § 1391(b). (Exhibit 6, Complaint at ¶ 7)

    **RESPONSE:** Admitted.

**Additional Relevant Facts**

7.    In 2005, Chicago H&S Hotel Property LLC ("H&S") purchased Hotel 71, a 40-story, 437 guestroom, full service hotel located at 71 East Wacker Drive (hereafter the "Property" or "Hotel 71"). *See* Declaration of Patrick J. O'Malley (hereafter "O'Malley Decl.") at ¶ 8.

    **RESPONSE:** Admitted upon information and belief.

8.    H&S borrowed heavily to finance this acquisition including $100 million as a senior mortgage loan (the "Senior Loan") as well as a $27.3 million mezzanine loan. (O'Malley Decl. at ¶ 9)

    **RESPONSE:** Admitted upon information and belief.

9.    Oaktree, through Hotel 71 Mezz Lender, provided this second level of financing. (O'Malley Decl. at ¶ 10)

    **RESPONSE:** Admitted upon information and belief.

10.    Among the contracts assumed by Chicago H&S as part of its acquisition of Hotel 71, were various collective bargaining agreements with union workers employed at the hotel. Specifically H&S became a party to the Agreement Between Joint Chicago Executive Board Of The Unite Here, Local 1 And Unite Here Local 450 And Chicago H&S Hotel Property, LLC (D/B/A Hotel 71) (the "CBA"), when H&S assumed this agreement from the former owner of the hotel. (O'Malley Decl. at ¶ 11)

2

**RESPONSE:** Admitted.

11. As part of the CBA, H&S also assumed the obligation incorporated in the CBA to continue to make pension contributions on behalf of union employees to what was then the HEREIU Pension Fund. TheNRF [sic], formerly known as UNITE HERE National Retirement Fund, and successor in interest to the HEREIU Pension Fund, is a multiemployer pension plan, jointly administered by trustees representing the union and participating employers. *Id.*

**RESPONSE:** Admitted.

12. H&S, however, soon ran into financial difficulties and in 2007 H&S defaulted on both the Senior and Mezzanine loans. In early October 2007, following the H&S default on its loan, Hotel 71 Mezz Lender acquired ownership of H&S through a UCC foreclosure sale so that it could attempt to collect on its loan. (O'Malley Decl. at ¶ 12)

**RESPONSE:** Admitted upon information and belief.

13. On October 29, 2007, H&S filed for Chapter 11 bankruptcy relief in the Northern District of Illinois. As a creditor in that bankruptcy case, the NRF filed 14 timely Proofs of Claim asserting various obligations it claimed to be owed. (O'Malley Decl. at ¶ 13)

**RESPONSE:** Admitted that on October 29, 2007, H&S filed for Chapter 11 bankruptcy relief in the Northern District of Illinois. Admitted that the NRF timely filed proofs of claim in H&S's Chapter 11 Bankruptcy case, including a proof of claim for contingent withdrawal liability. Otherwise, denied.

14. H&S filed a plan of reorganization and on March 21, 2008, after multiple days of contested hearings, the Bankruptcy Court confirmed an amended version of the H&S Plan of Reorganization. (O'Malley Decl. at ¶ 14)

**RESPONSE:** Admitted.

15. Throughout the H&S Chapter 11 Bankruptcy case, the NRF received notice electronically or by US Mail of a series of dates and events including: (1) the Cure Notice for Assumed Contracts; (2) the Sale of the Property; (3) the hearing to confirm the Sale of the Property; (4) the Plan and voting requirements; (5) the hearing to confirm the Plan; and (6) the entry of the Order Confirming the Plan. Despite all of these notices and despite having 14 filed claims against H&S, NRF did not file any objection to Plan confirmation, or participate in any way in the contested hearing to confirm the Plan. (O'Malley Decl. at ¶ 15)

**RESPONSE:** Admitted that the NRF was given notice electronically or by US Mail of: (1) the Sale of the Property, (2) the hearing to confirm the Sale of the Property, (3) the Plan and voting requirements, and (4) the entry of the Order Confirming the Plan. Further admitted that the NRF did not file any objection to Plan or participate in the hearing to confirm the plan. Denied that the NRF was given notice electronically or by US Mail of (1) the Cure Notice for Assumed Contracts and (2) the Hearing to confirm the Plan. (Affidavit of Jaimie C. Davis, Esq. dated July 19, 2013 ("Davis Aff.") ¶ 2, annexed hereto as Exhibit F.) Admitted that the NRF timely filed proofs of claim in H&S's Chapter 11 Bankruptcy case, including a proof of claim for contingent withdrawal liability. Otherwise, denied.

16. The NRF did not object to any of the H&S Plans including the Second Amended Version confirmed by the Bankruptcy Court, and the Plan was heavily negotiated and contested by multiple parties-in-interest, including Hotel 71 Mezz Lender and the holder of the Senior Loan. The confirmed Plan required that the Property be sold free and clear of liens on a "going concern" basis to a buyer who assumed the collective bargaining agreements and continued to make payments to the NRF. The Plan further provided for an orderly distribution of H&S's

4

assets (including the proceeds of the sale) to those creditors holding allowed claims. (O'Malley Decl. at ¶ 16 and Exhibit B)

> **RESPONSE:** Admitted that the NRF did not object to any of the H&S Plans, including the Second Amended Version confirmed by the Bankruptcy Court. Further admitted, upon information and belief, that the Plan was negotiated and contested by multiple parties-in-interest. The allegations contained in paragraph 16 refer to the Plan, a document which speaks for itself. To the extent the allegations contained in paragraph 16 differ from the terms of the Plan, they are denied.

17. In July 2008, pursuant to the confirmed Plan, the Bankruptcy Court approved the sale of Property to the holder of the Senior Loan for approximately $105 million. The purchaser expressly assumed the H&S collective bargaining agreements, including H&S's obligation to make contributions to the NRF. The proceeds from the sale of the Property and the additional funding provided by the lender were used to pay various creditors including the NRF. (O'Malley Decl. at ¶ 17)

> **RESPONSE:** The allegations contained in paragraph 17 refer to the Plan, a document which speaks for itself. To the extent the allegations contained in paragraph 17 differ from the terms of the Plan, they are denied. Otherwise, admitted.

18. Significantly, under the Plan, Hotel 71 Mezz Lender, which held claims of more than $27 million, was not paid from these proceeds. Instead, Hotel 71 Mezz Lender agreed to subordinate its claims to the claims of other unsecured creditors, enhancing those creditors' recovery, including the recovery of the NRF. (O'Malley Decl. at ¶ 18)

> **RESPONSE:** The allegations contained in paragraph 18 are legal conclusions to which no response is required. To the extent a response is required, the allegations contained in

5

paragraph 18 refer to the Plan, a document which speaks for itself. To the extent the allegations contained in paragraph 18 differ from the terms of the Plan, they are denied.

20 [sic]. As consideration for this significant concession by Oaktree, the Plan provided a release of any and all claims against them and enjoined future suits relating to those claims. Accordingly, Section 13.1 of the Plan provides:

> [t]he distributions received by creditors, or contemplated, under this Plan are in full and final satisfaction and settlement of any and all Claims arising in connection with [H&S's] Chapter 11 case that such creditors may have against the Releasees, the Debtor's estate, the estate assets and the assets contemplated under this Plan to satisfy Claims, and all such claims are released.

O'Malley Decl. at ¶ 19. Exhibit A [Plan] at § 13.1.

**RESPONSE:** The allegations contained in paragraph 20 refer to the Plan, a document which speaks for itself. To the extent the allegations contained in paragraph 20 differ from the terms of the Plan, they are denied. The NRF denies the accuracy of the quotation from Section 13.1 of the Plan contained in paragraph 20 because the phrase "distributions to be received by creditors" in Section 13.1 of the Plan is incorrectly rendered as "distributions received by creditors" in paragraph 20. (*See* Second Amended Liquidating Plan of Reorganization § 13.1, annexed to Complaint as Exhibit A.) Further answering, the NRF denies the remaining allegations of paragraph 20.

21. The Plan, in turn, defines "Releasees" as "the Debtor, its current owner [i.e. Oaktree] and any officers, members and managers of its current owner, any professional retained by the current owner, the Trustee, Canyon/Brickman, (except as to claims of the Trustee) the Committee and any professional retained by the Committee." (O'Malley Decl. at ¶ 20)

**RESPONSE:** Admitted except that, upon information and belief, Hotel 71 Lender, not Oaktree, is the "current owner." (*See* Complaint ¶ 12; Answer ¶ 12.)

6

22. Section 13.4 of the Plan then provides an injunction barring claims involving any matter released under Section 13.1 Specifically, this injunctive provision states:

> ***all holders of Claims shall be permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, on account of any Claim, Interest, obligation, debt, right, cause of action, remedy or liability released or to be released pursuant to the Plan.***

(O'Malley Decl. at ¶ 21)

**RESPONSE:** Admitted.

23. The bold, underlining and italics were all in the Plan. (O'Malley Decl. at ¶ 21, Exhibit A)

**RESPONSE:** Admitted.

24. At the time it filed its bankruptcy case on October 29, 2007, H&S was current on all of its obligations under the CBA including contributions to the NRF. Throughout the H&S Chapter 11 proceedings and reorganization, H&S continued to honor the CBA and to make all required pension fund contributions to the NRF. (O'Malley Decl. at ¶ 24)

**RESPONSE:** Denied because, at the time H&S filed its bankruptcy case and thereafter, H&S was delinquent in its contributions to the NRF. (*See* Proof of Claim No. 98-1, annexed hereto as Exhibit G; Proof of Claim 331-1, annexed hereto as Exhibit H.)

25. The purchaser of Hotel 71 expressly assumed the CBA and continued to make all required pension contributions to the NRF. (O'Malley Decl. at ¶ 25)

**RESPONSE:** Admitted.

26. The current owner of Hotel 71, the Capella Hotel Group, has similarly continued payments under the CBA, including all required contributions to the NRF. Thus, despite the bankruptcy and sale of the Property, the NRF has received an unbroken schedule of timely

7

contributions on behalf of the employees covered by the CBA. (O'Malley Decl. at ¶ 26 and Exhibit C)

> **RESPONSE:** Denied because (1) upon information and belief, Capella Hotel Group was the manager of the hotel, not the owner of the hotel, for a period of time, and (2) the employer that contributes to the NRF with respect to Hotel 71 is not current in its contributions to the NRF as of the date hereof. (Declaration of Capella Hotel Group, annexed to O'Malley Declaration as Exhibit C, ¶¶ 3-4; Davis Aff. ¶ 3.)

27. Although each successor owner of Hotel 71 assumed the obligations under the CBA and despite the continued contributions to the NRF, the NRF and its predecessors filed claims in the H&S bankruptcy contending that the sale of Hotel 71 to the Senior Loan Holder constituted a "withdrawal event" which subjected H&S to additional "withdrawal liability." (O'Malley Decl. at ¶ 27)

> **RESPONSE:** Admitted.

28. To that end, the NRF filed proofs of claim for various amounts, including for withdrawal liability purportedly owed by H&S resulting from its sale of the hotel and related property to the Purchaser. The H&S bankruptcy estate contested the withdrawal liability claim. After a series of negotiations, in August 2009, NRF and H&S stipulated to resolve all claims of the NRF, including its claim for "withdrawal liability" by allowing the NRF a single general unsecured claim of $550,000. (The stipulation explicitly noted that H&S did not admit the existence of withdrawal liability.) (O'Malley Decl. at ¶ 28 and Exhibit D)

> **RESPONSE:** Admitted that the NRF filed proofs of claim and that H&S contested the withdrawal liability. The allegations contained in paragraph 28 refer to the *Stipulation Resolving Objection to the Claims of UNITE HERE National Retirement Fund* (the

8

"Stipulation"), a document which speaks for itself. To the extent the allegations contained in paragraph 28 differ from the terms of the Stipulation, they are denied. Further answering, the NRF admits that H&S did not admit any withdrawal liability. The NRF denies the remaining allegations contained in paragraph 28.

29. On April 1, 2013, nearly five years after the sale of the Property as part of the confirmed Plan of Reorganization, the NRF sent a letter to Oaktree demanding payment of $2.17 million in "withdrawal liability" (Exhibit 2)

**RESPONSE:** The allegations contained in paragraph 29 refer to the Plan and the April 1, 2013 letter from the NRF's counsel to Hotel 71 Lender's counsel (the "April 1, 2013 Letter"), documents which speak for themselves. To the extent the allegations contained in paragraph 29 differ from the terms of the Plan and/or the April 1, 2013 Letter, they are denied.

30. The NRF's letter demanded that Oaktree make its first payment of $71,258.77 by May 1, 2013 and went on to assert that the obligation is owed by all members of the H&S "controlled group", which purportedly includes both Oaktree and other entities owned by Oaktree that never had any obligation to contribute to the NRF. (Exhibit 2)

**RESPONSE:** The allegations contained in paragraph 30 refer to the April 1, 2013 Letter, a document which speaks for itself. To the extent the allegations contained in paragraph 30 differ from the terms of the April 1, 2013 Letter, they are denied. Otherwise admitted.

31. Oaktree responded on April 18, informing the NRF that Section 13.1 of the Plan unambiguously released any alleged withdrawal liability claim and that Section 13.4 enjoined the

9

NRF from any further legal proceeding seeking to collect this alleged liability against either Oaktree itself or any member of the Oaktree group. (Exhibit 3)

> **RESPONSE:** The allegations contained in paragraph 31 refer to the April 18, 2013 Letter from Oaktree's counsel to the NRF's counsel (the "April 18, 2013 Letter"), a document which speaks for itself. To the extent the allegations contained in paragraph 31 differ from the terms of the April 18, 2013 Letter, they are denied. The NRF admits that Oaktree responded on April 18, 2013.

32. Far from retracting its arguments, however, on Friday April 26, 2013, the NRF's counsel again wrote to Oaktree contending that the NRF was still entitled to pursue claims for withdrawal liability and that the NRF did not intend to revoke its April 1, 2013 withdrawal liability assessment. (Exhibit 4)

> **RESPONSE:** The allegations contained in paragraph 32 refer to the April 26, 2013 Letter from the NRF's counsel to Oaktree's counsel (the "April 26, 2013 Letter"), a document which speaks for itself. To the extent the allegations contained in paragraph 32 differ from the terms of the April 26, 2013 Letter, they are denied. Otherwise, admitted.

33. In light of the NRF's continued resistance to the clear terms of the Plan and the Orders of the Bankruptcy Court, Oaktree filed its Complaint for Declaratory Relief on May 1, 2013. (Exhibit 6)

> **RESPONSE:** Denied that the NRF has resisted the terms of the Plan and the Orders of the Bankruptcy Court. Admitted that Oaktree filed a Complaint for Declaratory Relief on May 1, 2013.

34. On June 27, 2013, in order to preserve its rights to challenge the NRF's withdrawal claim, Oaktree filed a letter with the NRF requesting further review of the NRF's withdrawal liability assertion. (Exhibit 7)

**RESPONSE:** The allegations contained in paragraph 34 are legal conclusions to which no response is required. To the extent a response is required, the allegations contained in paragraph 34 refer to the June 27, 2013 letter from Oaktree's counsel to the NRF's counsel (the "June 27, 2013 Letter"), a document which speaks for itself. To the extent the allegations contained in paragraph 34 differ from the terms of the June 27, 2013 Letter, they are denied. The NRF admits that it received a letter dated June 27, 2013 from Oaktree requesting review of the NRF's withdrawal liability assertion.

## DEFENDANT/COUNTER CLAIMANT'S
## STATEMENT OF ADDITIONAL MATERIAL FACTS

A. In early October 2007, Hotel 71 Mezz Lender LLC ("Mezz Lender") assumed a 100% ownership interest in Chicago H&S Hotel Property, LLC ("Chicago H&S"); Mezz Lender held that interest as of March 21, 2008, the date the Bankruptcy Court confirmed the Bankruptcy Plan and approved the Disclosure Statement for the Debtor's Liquidating Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code ("Disclosure Statement"); and neither Mezz Lender nor Chicago H&S advised the Bankruptcy Court after March 21, 2008 and before the date of the sale of Chicago H&S of a change in the ownership of H&S. (Complaint ¶¶ 12, 24; Answer ¶¶ 12, 24; Disclosure Statement, annexed as Exhibit 1 to Order (A) Approving the Disclosure Statement for the Debtor's Liquidating Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, and (B) Confirming Debtor's Second

Amended Liquidating Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, annexed to Complaint as Exhibit B, § III.A.)

      B.      During the period from early October 2007 through March 21, 2008 Oaktree Capital Management, L.P. ("Oaktree Management") owned or controlled Mezz Lender, and neither Mezz Lender, Chicago H&S, nor Oaktree Management advised the Bankruptcy Court after March 21, 2008 and before the date of the sale of Chicago H&S of a change in the relationship between Oaktree Management and Mezz Lender. (*See* H&S's Statements of Financial Affairs, annexed hereto as Exhibit I, at Statement of Financial Affairs ¶ 21(b); Disclosure Statement § III.A.)

      C.      In March 2008, the Honorable Eugene R. Wedoff held hearings (the "Hearings") regarding confirmation of Chicago H&S's reorganization plan (the "Plan"). (*See* Transcript of March 11, 2008 Morning Hearing ("1st Hearing Tr."), annexed hereto as Exhibit A; Transcript of March 11, 2008 Afternoon Hearing ("2nd Hearing Tr."), annexed hereto as Exhibit B; Transcript of March 19, 2008 Hearing ("3rd Hearing Tr."), annexed hereto as Exhibit C; and Transcript of March 21, 2008 Hearing ("4th Hearing Tr."), annexed hereto as Exhibit D (collectively, the "Transcripts").)

      D.      Judge Wedoff presided over two separate Hearings on March 11, 2008 (the "First Hearing" and "Second Hearing," respectively), one hearing on March 19, 2008 (the "Third Hearing") and one hearing on March 21, 2008 (the "Fourth Hearing"). (*See generally* Transcripts.)

      E.      The Transcripts do not reflect that Section 13.4 of the Plan was discussed at the hearings. (*See generally* Transcripts.)

F.	A central issue raised by objectors during the Hearings was the scope of the release in Section 13.1 of the Plan. (*See generally* Transcripts.)

G.	Objectors were concerned, *inter alia*, that the Plan could be interpreted as releasing third-party claims. (*See, e.g.*, 1st Hearing Tr. 6:8-11, 8:8-10; 2nd Hearing Tr. at 9:5-10, 28:18-29:1, 32:18-22; 4th Hearing Tr. at 77:24-79:7.)

H.	Daniel Zazove—current counsel to Plaintiffs/Counter Defendants—represented Chicago H&S Hotel Property, LLC at the Hearings. (*See generally* Transcripts.)

I.	During the Hearings, Mr. Zazove repeatedly represented to the Bankruptcy Court that the Plan does not release third-party claims. (*See* 2nd Hearing Tr. at 10:1; 4th Hearing Tr. at 37:22-38:6, 90:21-22.)

J.	During the Second Hearing, in response to a statement by an objector to the Plan, Mr. Zazove represented that the Plan does not release third-party claims, which the Bankruptcy Court acknowledged:

> "MR. JACOBSEN [counsel to objecting creditor]: At this point we are objecting to the scope of the releases . . . . The language of the plan could be construed as an attempt to release third-party claims . . . .
> . . .
> THE COURT: Well, if there's anything that could be construed that way in the plan, Mr. Zazove's body language indicates that he will disaffirm any such attempt.
> MR. JACOBSON: Okay. Great, Judge.
> MR. ZAZOVE: No third-party releases.
> . . .
> THE COURT: Okay. I thought so, too, when having read it."

(2nd Hearing Tr. at 9:5-10, 9:21-10:5.)

K.	During the Second Hearing, Judge Wedoff acknowledged Mr. Zazove's statements that the Plan does not release third-party claims:

13

- "THE COURT: We have a clarification on the record that the plan contains no third-party releases."

  (2nd Hearing Tr. at 18:8-10.)

- THE COURT: Well, I repeated your statements that there were no third-party releases.

  MR. ZAZOVE: I understand."

  (2nd Hearing Tr. at 21:10-12.)

- "THE COURT: I don't have the language in front of me, so I'm not able to look at that and come to any definitive conclusion. If you're happy to have Mr. Zazove say, as he said earlier today, there's no third-party release of this plan, then we'll let it rest at that."

  (2nd Hearing Tr. at 32:23-33:3.)

L. During the Third Hearing, Mr. Zazove elicited testimony confirming that the Plan contained no releases of third-party claims. He asked Patrick O'Malley, the Chief Restructuring Officer in Chicago H&S's bankruptcy proceedings, to verify that "[t]hese are only debtor releases, are they not?" (3rd Hearing Tr. at 146:13-14.) Mr. O'Malley responded: "That's correct. There is no intention to release third-party claims." (*Id.* at 146:15-16.)

M. During the Fourth Hearing, Judge Wedoff again acknowledged Mr. Zazove's statements that the Plan does not contain third-party releases, which statements Mr. Zazove confirmed and reasserted:

> "THE COURT: Okay. First of all, you made clear earlier that there are no third-party releases.
> MR. ZAZOVE: That's correct. . . .
> THE COURT: The only releases being offered here are being offered by the debtor?
> MR. ZAZOVE: That's correct. And to the extent that that's not clear, I'm making that representation once again.
> THE COURT: All right."

(4th Hearing Tr. at 37:22-38:6.)

14

N.     During the Fourth Hearing, Mr. Zazove again represented to the Bankruptcy Court that the Plan contains no third-party releases:

> "MR. ZAZOVE: Your Honor, once again I represent to you there are no third-party releases."
>
> (4th Hearing Tr. at 90:21-22.)

O.     During the Hearings, counsel and the Bankruptcy Court discussed the permissibility of third-party releases. (*See generally* Transcripts.)

P.     At the Second Hearing, Judge Wedoff opined that releases of third-party claims against non-debtors are impermissible absent the express consent of the affected creditors, by stating:

- "[T]he only way they could give a [third-party release] is if the creditors who are asked to give that release are allowed to separately provide for it. So it becomes a contractual matter. The plan itself without that sort of separate contractual release can't be effected." (2nd Hearing Tr. at 9:12-18.)

- "The Bankruptcy Code plainly allows for the adjustment of the relationship between the debtor and its creditors. And if you want to provide that the debtor voluntarily gives releases, anyone claiming through the debtor would be bound by that. But to the extent that there are independent causes of action, I don't know what they might be, but causes of action that do not derivatively stem from the debtor's rights but are independent rights that third parties have, I don't see how you can eliminate those rights by the mere fact that those people happen to be creditors in the debtor's estate." (*Id.* at 26:13-25.)

Q.     At the Third Hearing, Judge Wedoff acknowledged that subsequent to the Second Hearing, the U.S. Court of Appeals for the Seventh Circuit issued a decision setting forth parameters for permissible third-party releases. (*See* 3rd Hearing Tr. at 12:14-13:4.)

R.     Mr. Zazove represented to the Bankruptcy Court that notwithstanding the Seventh Circuit's recent decision, the releases in the Plan had not been broadened and remained consistent with Judge Wedoff's guidance at the Second Hearing : "The limitations that we have

15

included were the ones that you gave some guidance on the last time we were in the courtroom. We have not broadened them based upon that decision." (3rd Hearing Tr. at 6:11-15.)

  S. The NRF never received a request in connection with the Chicago H&S bankruptcy proceedings for a separate contractual release of claims it may have against non-debtor parties, including, without limitation, claims for withdrawal liability. (Affidavit of Richard N. Rust dated July 17, 2013 ("Rust Aff."), annexed hereto as Exhibit E, ¶ 2.)

  T. The Transcripts do not reflect that Chicago H&S or any other Plan proponent sought separate contractual releases from the NRF or that withdrawal liability to the NRF was even discussed. (*See generally* Transcripts.)

  U. By Order dated March 21, 2008, the Bankruptcy Court approved the Plan, "having heard and considered . . . all objections and the arguments of counsel made at the [Hearings] to . . . confirm the Plan." (Order at 1-2.)

  V. Although the July 2008 purchaser of the Property assumed the CBA and the obligation therein to contribute to the NRF, the parties to the July 2008 sale of the Property did not satisfy the other requirements of Section 4204(a)(1) of ERISA. (Rust. Aff. ¶ 3.)

  W. The July 2008 purchaser of the Property did not provide the NRF a bond or an amount held in escrow. (Rust. Aff. ¶ 3.)

  X. Upon information and belief, the contract for July 2008 sale did not contain the language required by Section 4204(a)(1)(C) of ERISA.

  Y. Following the July 2008 sale of the Property, the NRF filed a proof of claim for withdrawal liability in the estimated amount of $1,276,271.33. (Rust Aff. ¶ 4.)

  Z. On June 21, 2011, the NRF received a final distribution from the Chicago H&S Hotel Property, LLC bankruptcy in the amount of $44,969.02. (Rust Aff. ¶ 5.)

AA. On May 3, 2013, the NRF received an additional distribution from the Chicago H&S Hotel Property, LLC bankruptcy in the amount of $23,974.38. (Rust Aff. ¶ 6.)

17

Dated: July 19, 2013
Chicago, Illinois

By: /s/ Michele Reynolds
Michele Reynolds
DOWD, BLOCH & BENNETT
8 S. Michigan Ave., 19th Floor
Chicago, IL 60603
Telephone: (312) 372-1361
Facsimile: (312) 372-6599

-and-

Ronald E. Richman (*pro hac vice*)
Jaimie C. Davis (*pro hac vice*)
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

*Attorneys for the National Retirement Fund and the Trustees of the National Retirement Fund*