**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HOTEL 71 MEZZ LENDER LLC, a Delaware limited liability company; and OAKTREE CAPITAL MANAGEMENT, L.P., a Delaware limited liability company; | Case No. 13-3306 |
| Plaintiffs, | |
| v. | Honorable Ruben Castillo |
| THE NATIONAL RETIREMENT FUND, | Magistrate Judge Brown |
| Defendant. | |
| THE NATIONAL RETIREMENT FUND and THE TRUSTEES OF THE NATIONAL RETIREMENT FUND, | |
| Counter Claimants, | |
| v. | |
| HOTEL 71 MEZZ LENDER LLC, a Delaware limited liability company; OAKTREE CAPITAL MANAGEMENT, L.P., a Delaware limited liability company; and JOHN DOES 1-10 (all other trades or businesses under common control with Chicago H&S Hotel Property, L.L.C.), | |
| Counter Defendants. | |

**DEFENDANT/COUNTERCLAIMANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS/COUNTER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendant/Counter Claimant, the National Retirement Fund (the "NRF"), by and through its undersigned counsel, respectfully submits this memorandum of law in opposition to the motion for summary judgment filed by Plaintiffs/Counter Defendants, Hotel 71 Mezz Lender LLC ("Mezz Lender") and Oaktree Capital Management, L.P. ("Oaktree Capital," and together with Mezz Lender, the "Oaktree Parties").

## PRELIMINARY STATEMENT

The issue before the Court is whether the Bankruptcy Court-approved reorganization plan of debtor Chicago H&S Hotel Property, LLC released non-debtor members of the debtor's controlled group—including Mezz Lender—from the NRF's claims for withdrawal liability triggered by the debtor's withdrawal. The Oaktree Parties' principal claim is that the third-party release they received under the reorganization plan absolves them from their joint and several withdrawal liability obligations to the NRF under the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA"). The transcripts of the confirmation hearings before the Bankruptcy Court belie their assertion. During the plan confirmation hearings, the Oaktree Parties' counsel—then counsel to the debtor—repeatedly represented to the Bankruptcy Court that the reorganization plan does not release third-party claims. On this basis alone, the Oaktree Parties' motion should be denied.

Even assuming, *arguendo*, that the reorganization plan releases third-party claims, two independent reasons compel denial of the Oaktree Parties' motion. *First*, extending the release to the NRF's withdrawal liability claims is unenforceable under Seventh Circuit precedent—which only permits narrowly tailored non-debtor releases in unusual circumstances not present here. *Second*, discharging non-debtor controlled group members would subvert Congress' intent in creating joint and several liability under ERISA.

Moreover, the reorganization plan's injunction provision extends only to parties otherwise liable for claims released under the plan. The injunction provision, therefore, does not prohibit the NRF from pursuing withdrawal liability claims against the any member of H&S's controlled group.

Granting the Oaktree Parties' motion would require writing into the reorganization plan releases and injunctions contrary to ERISA and broader than those approved—or even considered—by the Bankruptcy Court. The motion should thus be denied.

## FACTUAL BACKGROUND

### A.    The Parties

The NRF is a multiemployer pension fund jointly administered by union and employer trustees. (SOFR ¶ 3.)[1] Chicago H&S Hotel Property, LLC d/b/a Hotel 71 ("H&S" or the "Debtor"), as owner of a hotel property in Chicago, Illinois, was a contributing employer to the NRF or its predecessor pursuant to a collective bargaining agreement with the Chicago Joint Executive Board of UNITE HERE, Local 1 and Local 450 (the "CBA"). (*Id* ¶¶ 7, 10.) In early October 2007, Mezz Lender, an entity owned or controlled by Oaktree Capital, assumed a 100% ownership interest in H&S. (*Id.* ¶¶ 12, A, B.)

### B.    The H&S Reorganization Plan

On October 29, 2007, H&S filed a Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Illinois before Judge Eugene R. Wedoff. (SOFR ¶ 13.) Among other claims, the NRF filed a proof of claim for contingent withdrawal liability, in the event H&S withdrew from the NRF post-petition. (*Id.* ¶ 13; Compl. ¶ 27; Ans. ¶ 27.) In

---

[1] As used herein: (1) "Pl. Br. at __" refers to the referenced page of Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment filed on June 28, 2013; (2) "SOF, Exh. __" refers to the referenced exhibit annexed to Plaintiffs/Counter-Defendants' Statement of Undisputed Material Facts filed June 28, 2013; and (3) "SOFR ¶ __" refers to the referenced paragraph of Defendant/Counter Claimant's Response to Plaintiffs/Counter Defendants' Statement of Material Facts filed on July 19, 2013.

March 2008, H&S filed a Second Amended Liquidating Plan of Reorganization Pursuant to

Chapter 11 of the United State Bankruptcy Code (the "Bankruptcy Plan"). (SOFR ¶ 14.)

Section 13.1 of the Bankruptcy Plan, which contains a release by holders of claims (including as

the NRF), provides:

> "The distributions to be received by creditors, or contemplated, under this Plan
> are in full and final satisfaction and settlement of any and all Claims arising in
> connection with the Debtor's Chapter 11 case that such creditors may have
> against the Releasees, the Debtor's estate, the estate assets and the assets
> contemplated under this Plan to satisfy Claims, and all such Claims are released."

(SOF, Exh. 1-A at Exhibit A, § 13.1) Section 13.4 of the Bankruptcy Plan, the injunction

provision, provides in relevant part that:

> "***all holders of Claims shall be permanently enjoined from commencing or
> continuing in any manner, any suit, action or other proceeding, on account of
> any Claim, Interest, obligation, debt, right, cause of action, remedy or liability
> released or to be released pursuant to the Plan*** . . . ."

(*Id.* § 13.4 (emphasis in original).) The Bankruptcy Plan defines "Releasees"—the parties

benefiting from the release of Claims in Section 13.1 and the injunction in Section 13.4—as:

> "the Debtor, its current owner and any officers, members and managers of its
> current owner, any professional retained by the current owner, the Trustee,
> Canyon/Brickman, (except as to claims by the Trustee) the Committee and any
> professional retained by the Committee."

(*Id.* art. II.)

Judge Wedoff presided over four confirmation hearings with respect to the

Bankruptcy Plan: two separate sessions on March 11, 2008 (the "First Hearing" and "Second

Hearing," respectively), one session on March 19, 2008 (the "Third Hearing") and a final session

on March 21, 2008 (the "Fourth Hearing," and collectively, the "Hearings"). (SOFR ¶ D.)

While Section 13.4 of the Bankruptcy Plan was not discussed during the Hearings, a central issue

raised by objectors was the scope of the release in Section 13.1. (*Id.* ¶¶ E, F.) These objectors

were concerned, *inter alia*, that the Bankruptcy Plan could be interpreted as releasing third-party claims—claims by creditors against non-debtor third-parties. (*Id.* ¶ G.)

In response to the objectors' concerns, Daniel Zazove—current counsel to the Oaktree Parties who represented the Mezz Lender-owned Debtor in the bankruptcy proceedings, including at the Hearings (*see* SOFR ¶ H)—repeatedly represented to the Bankruptcy Court, and the Bankruptcy Court acknowledged, that the Bankruptcy Plan does not release third-party claims. (*See id.* ¶ I.) For example:

- "MR. JACOBSEN [counsel to objecting creditor]: At this point we are objecting to the scope of the releases . . . . The language of the plan could be construed as an attempt to release third-party claims . . . .
  . . .
  THE COURT: Well, if there's anything that could be construed that way in the plan, Mr. Zazove's body language indicates that he will disaffirm any such attempt.
  MR. JACOBSON: Okay. Great, Judge.
  MR. ZAZOVE: No third-party releases.
  . . .
  THE COURT: Okay. I thought so, too, when having read it." (SOFR ¶ J.)

- "THE COURT: We have a clarification on the record that the plan contains no third-party releases." (*Id.* ¶ K.)

- "THE COURT: Well, I repeated your statements that there were no third-party releases.
  MR. ZAZOVE: I understand." (*Id.*)

- "THE COURT: I don't have the language in front of me, so I'm not able to look at that and come to any definitive conclusion. If you're happy to have Mr. Zazove say, as he said earlier today, there's no third-party release of this plan, then we'll let it rest at that." (*Id.*)

- "THE COURT: Okay. First of all, you made clear earlier that there are no third-party releases.
  MR. ZAZOVE: That's correct. . . .
  THE COURT: The only releases being offered here are being offered by the debtor?

> MR. ZAZOVE: That's correct.  And to the extent that that's not clear, I'm making that representation once again.
>
> THE COURT: All right."  (*Id.* ¶ M.)

- "MR. ZAZOVE: Your Honor, once again I represent to you there are no third-party releases."  (*Id.* ¶ N.)

Mr. Zazove also elicited testimony confirming that the Bankruptcy Plan contains no releases of third-party claims.  He asked Patrick O'Malley, the Chief Restructuring Officer in the Debtor's bankruptcy proceedings, to verify that "[t]hese are only debtor releases, are they not?"  (SOFR ¶ L.)  Mr. O'Malley responded: "That's correct.  There is no intention to release third-party claims."  (*Id.*)

At the Second Hearing, Judge Wedoff opined that releases of third-party claims against non-debtors are impermissible absent the express consent of the affected creditors:

- "[T]he only way they could give a [third-party release] is if the creditors who are asked to give that release are allowed to separately provide for it.  So it becomes a contractual matter.  The plan itself without that sort of separate contractual release can't be effected."  (SOFR ¶ P.)

- "The Bankruptcy Code plainly allows for the adjustment of the relationship between the debtor and its creditors. And if you want to provide that the debtor voluntarily gives releases, anyone claiming through the debtor would be bound by that.  But to the extent that there are independent causes of action, I don't know what they might be, but causes of action that do not derivatively stem from the debtor's rights but are independent rights that third parties have, I don't see how you can eliminate those rights by the mere fact that those people happen to be creditors in the debtor's estate."  (*Id.*)

At the Third Hearing, Judge Wedoff acknowledged that subsequent to the Second Hearing, the Seventh Circuit issued a decision setting forth parameters for permissible third-party releases.  (SOFR ¶ Q.)  Mr. Zazove represented to the Bankruptcy Court that notwithstanding the recent decision, the releases in the Bankruptcy Plan had not been broadened and remained consistent with Judge Wedoff's guidance at the Second Hearing.  (*Id.* ¶ R.)  The NRF never received a request in connection with H&S's bankruptcy proceedings for a separate

contractual release of claims it may have against non-debtor parties, including, without limitation, claims for withdrawal liability. (*Id.* ¶ S.) The record of the Hearings does not reflect that the Debtor sought separate contractual releases from the NRF or that withdrawal liability to the NRF was even discussed. (*Id.* ¶ T.) On March 21, 2008, the Bankruptcy Court approved the Bankruptcy Plan, "having heard and considered . . . all arguments of counsel made at the hearing to . . . confirm the Plan"—including those made by Mr. Zazove. (*Id.* ¶ U.)

## C.      H&S's Withdrawal and Limited Payment of Withdrawal Liability

In July 2008, pursuant to the Bankruptcy Plan, H&S sold substantially all of its assets. (Compl. ¶ 18; Ans. ¶ 18.) The purchaser assumed the CBA and the obligation therein to contribute to the NRF. (SOFR ¶ 25.) The parties to the sale, however, did not satisfy the other requirements of Section 4204(a)(1) of ERISA which, if met, would have prevented the sale from triggering the Debtor's withdrawal from the NRF. Specifically: (1) the purchaser to the sale did not provide the NRF a bond or an amount held in escrow, as required by Section 4204(a)(1)(B); and (2) upon information and belief, the contract for sale did not contain the language required by Section 4204(a)(1)(C). (*Id.* ¶¶ W, X.) The sale, therefore, triggered a complete withdrawal. Among other claims, the NRF filed a proof of claim in the bankruptcy for withdrawal liability triggered by the sale in the estimated amount of $1,276,271.33. (*Id.* ¶ Y.) On June 21, 2011, the NRF received a final distribution in the amount of $44,969.02. (*Id.* ¶ Z.) On May 3, 2013, the NRF received an additional distribution in the amount of $23,974.38. (*Id.* ¶ AA.)

## D.      The NRF's Attempt to Collect the Balance of the Withdrawal Liability

On April 1, 2013, the NRF notified Mezz Lender that it and all other trades or businesses under common control with H&S are liable for the unpaid portion of H&S's withdrawal liability. (SOF, Exh. 2.) The NRF's letter demanded payment of withdrawal liability in the total amount of $2.17 million—representing the final calculation of withdrawal liability,

6

plus interest and less the $44,969.02 then received to date—payable commencing on May 1,

2013 in 43 quarterly installments of $71,258.77 each, plus a final payment of $11,046.65. (*Id.*)

On May 1, 2013, instead of paying the withdrawal liability installment due on that date, the

Oaktree Parties filed their Complaint for Declaratory Relief.

## ARGUMENT

## I.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if there is "no genuine issue as to any material

fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see*

*also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Even if a movant can establish that no

genuine issue of material fact exists, it is not entitled to summary judgment if it fails to show it is

entitled to judgment as a matter of law. *See, e.g.*, *Geary v. Chi. Tile Inst. Welfare Trust*, 93 C

7059, 1995 WL 228971, at *3 (N.D. Ill. Apr. 12, 1995). Based on the record of Debtor's

bankruptcy proceedings, the Oaktree Parties cannot establish that they are entitled, as a matter of

law, to a determination that the NRF is released and enjoined from pursuing claims against

H&S's controlled group for withdrawal liability.[2]

## II.

## THE OAKTREE PARTIES OWE WITHDRAWAL LIABILITY TO THE NRF.

The Oaktree Parties are not entitled to an order declaring that they have no

obligation to the NRF for withdrawal liability. The members of H&S's controlled group—

including, without limitation, Mezz Lender—remain jointly and severally liable for withdrawal

---

[2] To the contrary, for the reasons set forth herein, the NRF is entitled, as a matter of law, to a determination that nothing in the Bankruptcy Plan prohibits the NRF from pursuing withdrawal liability from H&S's controlled group. Accordingly, the NRF is filing simultaneously its own motion for summary judgment on the Oaktree Parties' claims.

liability, because the Bankruptcy Plan does not effectively release the NRF's claims against non-debtors.

**A.     The Bankruptcy Plan Does Not Release *Any* Third-Party Claims.**

To obtain the declaratory relief they seek, the Oaktree Parties must establish that the Bankruptcy Plan releases third-party claims—independent causes of action that creditors (*e.g.*, the NRF) separately have against non-debtor parties (*e.g.*, the Oaktree Parties)—including the NRF's withdrawal liability claims.  Fatal to the Oaktree Parties' motion, therefore, is the fact that the Bankruptcy Plan does not include *any* releases of third-party claims, as their counsel is well aware.

The NRF's withdrawal liability claims against the non-debtor members of H&S's controlled group—including, without limitation, Mezz Lender—are third-party claims not released under Section 13.1 of the Bankruptcy Plan.  That section releases only claims "arising in connection with the Debtor's Chapter 11 case."  (Bankruptcy Plan § 13.1.)  The NRF's claims arise separately, because controlled group members are independently liable under ERISA for H&S's withdrawal liability.  *See* Section 4001(b) of ERISA, 29 U.S.C. § 1301(b); 29 C.F.R. §§ 4001.2-.3; *see also Centr. States, Se. & Sw. Areas Pension Fund v. Landvatter*, No. 89 C 5228, 1992 WL 93227, at *2 (N.D. Ill. Apr. 30, 1992) (controlled group members remain jointly and severally liable for a bankrupt group member's withdrawal liability) (citing cases).  Neither the pendency of H&S's Chapter 11 case nor the fact that the sale triggering the withdrawal occurred in the context of the Chapter 11 case is relevant for purposes of determining the controlled group's withdrawal liability.

Mezz Lender's inclusion as a "Releasee"—as the then "current owner" of the Debtor—has no impact on the survival of its independent liability to the NRF.  As a Releasee, Mezz Lender only is absolved from claims as to the Debtor —including H&S's own liability for

the withdrawal liability. Mezz Lender, however, "remains separately liable for its own joint and several obligations as a solvent member of a control group." *I.A.M. Nat'l Pension Fund v. TMR Realty Co, Inc.*, 431 F. Supp. 2d 1, 25 (D.D.C. 2006) (non-debtor controlled group member liable for debtor's withdrawal liability notwithstanding bankruptcy plan provision releasing controlled group member, as successor-in-interest, from debtor's liabilities).

Mr. Zazove, counsel to the Oaktree Parties, is well aware that the Bankruptcy Plan does not release third-party claims—such as the NRF's withdrawal liability claims against non-debtors. As set forth above in more detail, while advocating on behalf of the Mezz Lender-owned Debtor for an order approving the Bankruptcy Plan, Mr. Zazove continually confirmed the absence of third-party releases, which the Bankruptcy Court acknowledged. (*See, e.g.*, SOFR ¶¶ J-K, M-N.) Indeed, Mr. Zazove's assurances were emphatic. (*See, e.g.*, *id.* ¶ N ("Your Honor, once again I represent to you there are no third-party releases.").) Mr. Zazove also elicited testimony during the Hearings from Mr. O'Malley, the Chief Restructuring Officer in the proceedings, confirming the absence of releases of third-party claims. (*See id.* ¶ L.) Judge Wedoff approved the Bankruptcy Plan based in part on "all arguments of counsel made at the hearing to . . . confirm the Plan"—including those made by Mr. Zazove. (*Id.* ¶ U.)

Given Mr. Zazove's conduct during the Hearings, it is baffling that the Oaktree Parties now base their action against the NRF entirely on the opposite assertion that "releases of third party claims in bankruptcy such as those received by Oaktree are permissible and appropriate." (Pl. Br. at 10.)[3] The Oaktree Parties' reliance on *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640 (7th Cir. 2008)—a case setting forth narrow parameters for permissible and appropriate third-party releases—is thus inappropriate.

---

[3] The Oaktree Parties' claims against the NRF are frivolous, given the stark contradiction between Mr. Zazove's representations to the Bankruptcy Court on behalf of the Mezz Lender-owned Debtor and his representations. The NRF, therefore, requests that the Court award it attorneys' fees in this action.

Mr. Zazove's statements during the Hearings regarding *Airadigm* confirm its inapplicability. At the Second Hearing—held a day before the Seventh Circuit's ruling in *Airadigm*—Judge Wedoff expressed his understanding that third-party releases are impermissible absent separate contractual consent from the affected creditors. (*See, e.g.*, SOFR ¶ P.) Although Judge Wedoff acknowledged during the Third Hearing that *Airadigm* was "not consistent with what [he] put on the record" previously, Mr. Zazove insisted that the scope of the releases had not been expanded post-*Airadigm*. (*See id.* ¶¶ Q, R.) He confirmed that "[t]he limitations that we have included [with respect to the releases] were the ones [Judge Wedoff] gave some guidance on last time." (*Id.* ¶ R.)[4] Given the absence of third-party releases, the Oaktree Parties' discussion of *Airadigm* is irrelevant and, as such, should be disregarded.

**B.** **Even Assuming, *Arguendo*, That the Bankruptcy Plan Releases Third-Party Claims, the Release Is Unenforceable Under Seventh Circuit Precedent.**

Even assuming, *arguendo*, that the release in Section 13.1 of the Bankruptcy Plan extends to third-party claims, it cannot extend as far as the Oaktree Parties argue. A third-party release of the NRF's withdrawal liability claims is not permissible under the Seventh Circuit's decision in *Airadigm* and its progeny. Although in *Airadigm* the Seventh Circuit opened the door to third-party releases in reorganization plans, it suggested that third-party releases would be granted only in extremely limited circumstances. *See* 519 F.3d at 657. Since *Airadigm*, the Seventh Circuit has cautioned that "[a] nondebtor release should only be approved in 'rare cases,' . . . because it is 'a device that lends itself to abuse.'" *In re Ingersoll, Inc.*, 562 F.3d 856, 865 (7th Cir. 2009) (citing *Airadigm* and *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136,

---

[4] Even under those "limitations," H&S never approached the NRF for a separate contractual release of third-party withdrawal liability claims. (SOFR ¶ S.)

141-42 (2d Cir. 2005)). For this reason, "[i]n most instances, [third-party] releases . . . will not pass muster under [*Airadigm*]." *Id.* at 865. This is one of those instances.

The third-party release of withdrawal liability claims the Oaktree Parties claim they received falls far short of *Airadigm*'s strict requirement that it be "appropriately tailored." *See* 519 F.3d at 657. In *Ingersoll*, the Seventh Circuit reluctantly approved a third-party release, but only because it "only cover[ed] claims arising from or relating to two cases" and the releasees could "still be sued by any number of creditors with independent claims." 562 F.3d at 865. To the contrary, here, the release—which purports to cover withdrawal liability claims not even discussed during the Hearings (*see generally* SOFR Exhs. A-D)—would provide "immunity affect[ing] matters beyond the jurisdiction of the bankruptcy court." *Airadigm*, 519 F.3d at 657; *see also In re GAC Storage Lansing, LLC*, 485 B.R. 174, 198 (Bankr. N.D. Ill. 2013) (refusing to grant a non-debtor broad relief from claims independent of the underlying bankruptcy); *In re Berwick Black Cattle Co.*, 394 B.R. 448, 457 (Bankr. C.D. Ill. 2008) (same). As discussed in Section II(A), *supra*, each of the Oaktree Party's obligations to pay withdrawal liability is separate and distinct from the Debtor's own liability, and thus outside the bankruptcy court's jurisdiction. Even under *Airadigm*, courts in the Seventh Circuit will not permit a third-party release—such as the one alleged here—functioning as "a full-fledged bankruptcy discharge arranged without a filing and without the safeguards of the [Bankruptcy] Code." *Ingersoll*, 562 F.3d at 865 (internal quotation marks omitted).

A third-party release of withdrawal liability claims also is impermissible under *Airadigm* because it was not necessary for the reorganization of the Debtor. Rather than being "central to the negotiation," like the release cautiously permitted in *Ingersoll*, 562 F.3d at 863, a release of withdrawal liability claims is not referenced in the Bankruptcy Plan and was not

discussed at the hearings. (*See generally* SOFR Exhs. A-D) Indeed, H&S could have

reorganized without triggering withdrawal liability in the first place—eliminating the need for

the release—had it and the purchaser structured the asset sale to meet the requirements of

Section 4204(a)(1) of ERISA. *See* 29 U.S.C. § 1384(a)(1) (a sale of assets does not trigger a

withdrawal if the parties to the sale meet certain requirements). The parties to the sale, however,

chose not to avail themselves of Section 4204(a)(1).

   "[P]rudence demands that third-party releases be viewed with a healthy dose of

skepticism." *Berwick Black Cattle*, 394 B.R. at 460. Even with a *minimal* dose of skepticism,

the Bankruptcy Plan cannot be viewed as providing the members of H&S's controlled group

with the "blanket immunity" that *Airadigm* forbids.

###   C.  Even Assuming, *Arguendo*, That the Bankruptcy Plan Releases Third-Party Claims, the Release Is Unenforceable Under ERISA.

   A release of withdrawal liability claims against H&S's non-debtor controlled

group members is unenforceable, as it would eradicate ERISA's principles of controlled group

liability. In 1980, Congress amended ERISA by enacting the Multiemployer Pension Plan

Amendments Act ("MPPAA") to address concerns "'that a significant number of

[multiemployer] plans were experiencing extreme financial hardship' . . . and that the imminent

application of ERISA to multiemployer plans 'might induce several large plans to terminate, thus

subjecting [ERISA's pension] insurance system to liability beyond its means.'" *Cent. States Se.

& Sw. Areas Pension Fund v. T.I.M.E.-DC, Inc.*, 826 F.2d 320, 321 (5th Cir. 1987) (quoting

*PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 721 (1984), and *Connolly v. PBGC*, 475 U.S. 211, 215

(1986)); *see* Sections 4201-4225 of ERISA, 29 U.S.C. §§ 1381-1405. With the MPPAA,

Congress created a carefully integrated system for the assessment and collection of withdrawal

liability under which, *inter alia*, a plan can collect withdrawal liability from a withdrawn

employer, as well as any member of its jointly and severally liable controlled group.  Section 4001(b) of ERISA, 29 U.S.C. § 1301(b); 29 C.F.R. §§ 4001.2-.3.  Congress enacted the controlled group provision "to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities."  *Teamsters Pension Fund-Bd. of Trs. of the W. Confer. v. Allyn Transp. Co.*, 832 F.2d 502, 507 (9th Cir. 1987) (internal citations and quotations omitted).

Courts (including in this district) have held consistently that discharging non-bankrupt members of a debtor's controlled group from their joint and several withdrawal liability would turn ERISA on its head.  *See, e.g.*, *Landvatter*, 1992 WL 93227 at *2 (citing *McDonald v. Centra, Inc.*, 118 B.R. 903, 926 (D. Md. 1990), *aff'd* 946 F.2d 1059 (4th Cir. 1991)) (discharging the controlled group "would turn the concept of joint and several liability from a tool of recovery into a shield against liability"); *NYSA-ILA Pension Trust Fund v. Lykes Bros, Inc.*, No. 96 Civ. 5616(DLC), 1997 WL 458777, at *6 (S.D.N.Y. Aug. 11, 1997) ("To allow the non-bankrupt [controlled group members] to escape liability would subvert the very purpose Congress had in mind in creating controlled group liability."); *McDonald v. Centra, Inc.*, 946 F.2d 1059, 1065 (4th Cir.1991) ("[W]hile a control group may be treated as a 'single employer' under [ERISA], it is a defendant with many pockets.  Were all members of the group discharged, this court would allow the [debtor's controlled group] to mark its front pockets bankrupt, while removing assets to its back pockets.").

Courts are required to "harmonize the purposes of the Bankruptcy Code and ERISA, as amended by the MPPAA."  *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 320 (3d Cir. 2011) (citing *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).  In reconciling the two statutes, the court must ensure that "Congress' objectives in passing the MPPAA are fulfilled."  *Id.* at 321.

13

Interpreting the Bankruptcy Plan as discharging H&S's controlled group's joint and several liability to the NRF runs afoul of this mandate. To the contrary, the Court can fulfill Congress' objectives in creating controlled group liability by determining that the Bankruptcy Plan does not prohibit the NRF's from pursuing and collecting withdrawal liability from any of the members of H&S's controlled group, including, without limitation, Mezz Lender.

For the foregoing reasons, the Bankruptcy Plan has no effect on the NRF's ability to pursue and collect withdrawal liability from H&S's controlled group. The Oaktree Parties therefore cannot establish that they are entitled to an order declaring that they have no withdrawal liability obligation to the NRF.

## III.

## THE BANKRUPTCY PLAN DOES NOT ENJOIN THE NRF FROM COLLECTING WITHDRAWAL LIABILITY FROM H&S'S CONTROLLED GROUP.

The Oaktree Parties are not entitled to an order enjoining the NRF from commencing or continuing in any manner any suit, action or other proceeding in pursuit of withdrawal liability against them and/or any other members of H&S's controlled group. The injunction in Section 13.4 of the Bankruptcy Plan protects only parties otherwise liable for claims "released or to be released pursuant to the Plan." (Bankruptcy Plan § 13.4.) Because none of the members of H&S's controlled group members are released from withdrawal liability under the Bankruptcy Plan (*see* Section II, *supra*), Section 13.4 does not enjoin the NRF from pursuing and collecting withdrawal liability from any or all of them. *Cf. Landvatter*, 1992 WL 93227 at *2 ("[d]ischarge of the debtor in bankruptcy does not affect the liability of its co-debtors for the debt" (citing Section 524(e) of the Bankruptcy Code and cases)).

## CONCLUSION

WHEREFORE, the NRF respectfully requests that the Court issue an order:

(i) denying the Oaktree Parties' motion for summary judgment in its entirety; and (ii) granting

the NRF such other and further relief as is just and proper.


Dated: July 19, 2013
Chicago, Illinois

By: _/s/ Michele Reynolds_____
Michele Reynolds
DOWD, BLOCH & BENNETT
8 S. Michigan Ave., 19th Floor
Chicago, IL 60603
Telephone: (312) 372-1361
Facsimile: (312) 372-6599

-and-

Ronald E. Richman (*pro hac vice*)
Jaimie C. Davis (*pro hac vice*)
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

*Attorneys for the National Retirement Fund and the*
*Trustees of the National Retirement Fund*

15