UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HOTEL 71 MEZZ LENDER LLC and
OAKTREE CAPITAL MANAGEMENT,
L.P.,

        Plaintiffs,

v.

THE NATIONAL RETIREMENT FUND,

        Defendant.

No. 13 C 03306

Chief Judge Rubén Castillo

THE NATIONAL RETIREMENT FUND
and THE TRUSTEES OF THE
NATIONAL RETIREMENT FUND,

        Counter Plaintiffs,

v.

HOTEL 71 MEZZ LENDER LLC,
OAKTREE CAPITAL MANAGEMENT,
L.P, and JOHN DOES 1-10,

        Counter Defendants.

## MEMORANDUM OPINION AND ORDER

This action arises from a dispute over whether an order entered by the United States

Bankruptcy Court for the Northern District of Illinois (the "Order") releases Oaktree Capital

Management, L.P. ("Oaktree") and Hotel 71 Mezz Lender LLC ("Mezz Lender") (collectively,

"Plaintiffs") from withdrawal liability incurred under the Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* and owed to The National Retirement Fund

("NRF" or "Defendant") and its Board of Trustees ("Trustees"). Plaintiffs seek a declaration that

the Second Amended Liquidating Plan of Reorganization (the "Plan") resolving the dissolution

of Chicago H&S Hotel Property, L.L.C. ("Chicago H&S") releases Plaintiffs from any withdrawal liability incurred by the dissolution of Chicago H&S.[1] Plaintiffs also request that the Court find that the Plan enjoins NRF from asserting any claim against Plaintiffs and all other trades and businesses under common control with Chicago H&S ("the Controlled Group"). NRF and Trustees bring a counterclaim against Plaintiffs and the Controlled Group ("John Does 1-10") seeking to collect withdrawal liability, interest, liquidated damages, and attorneys' fees and costs pursuant to ERISA. The parties previously moved for summary judgment on their respective legal claims without any indication that factual discovery was necessary. This Court denied NRF's motion for summary judgment on its counterclaim, and granted Plaintiffs' motion for summary judgment. This Court concluded that Mezz Lender was not a trade or business with any legal withdrawal liability exposure, and therefore it did not need to address the potential bankruptcy court release issue. *See Comm'r of Internal Revenue v. Groetzinger*, 480 U.S. 23 (1987). NRF appealed the Court's ruling, and the U.S. Court of Appeals for the Seventh Circuit vacated the judgment and remanded for further proceedings because NRF did not have a fair opportunity for discovery and express notice that a judgment may be entered against it. *See Hotel 71 Mezz Lender L.L.C. v. The Nat'l Ret. Fund*, 778 F.3d 593, 607 (7th Cir. 2015). Presently before the Court is Plaintiffs' renewed motion for summary judgment, which has been fully briefed, with proper notice and a fair opportunity for discovery. For the reasons stated below, the motion is granted in part and denied in part.

---

[1] ERISA imposes "withdrawal liability" on employers who withdraw, partially or completely, from an underfunded multiemployer pension fund. *See* 29 U.S.C. §§ 1381-1405. Normally, a complete withdrawal occurs when an employer "permanently ceases to have an obligation to contribute to the plan" or "permanently ceases all covered operations under the plan." *Id.* § 1383(a).

2

# RELEVANT FACTS[2]

Mezz Lender is a Delaware limited liability company with its principal place of business in Wilmington, Delaware. (R. 72, Def.'s Rule 56.1 Resp. ¶ 1.) Oaktree is a Delaware limited partnership with its principal place of business in Los Angeles, California, and is the parent company of Mezz Lender. (*Id.* ¶ 2; R. 75, Pls.' Resp. Add'l Facts ¶ 34.) The NRF, formerly known as UNITE HERE National Retirement Fund ("UNITE HERE"), and successor-in-interest to the HEREIU Pension Fund, is a multi-employer pension fund, jointly administered by union and employer trustees. (R. 72, Def.'s Rule 56.1 Resp. ¶ 3.)

## I.    Purchase of Hotel 71

In 2005, Chicago H&S purchased Hotel 71, a 40-story, 437-guestroom, full service hotel located at 71 East Wacker Drive in Chicago, Illinois. (*Id.* ¶ 7.) Chicago H&S borrowed heavily to finance this acquisition, including a $100 million senior mortgage loan (the "senior loan"), as well as a $27.3 million mezzanine loan (the "mezz loan").[3] (*Id.* ¶ 8.) Oaktree, through Mezz Lender, provided financing for the mezz loan. (*Id.* ¶ 9.) Upon its acquisition of Hotel 71, Chicago H&S became a party to several pre-existing collective bargaining agreements with union workers employed at the hotel, including the Agreement Between Joint Chicago Executive Board Of The UNITE HERE, Local 1 And UNITE HERE Local 450 And Chicago H&S Hotel

---

[2]  The Court takes the undisputed facts from the parties' Local Rule 56.1 statements of material facts. (R. 71, Plaintiffs/Counter Defendants' Statement of Undisputed Material Facts ("Pls.' Facts"); R. 72, Defendant/Counter Claimant's Response to Plaintiffs/Counter Defendants' Statement of Undisputed Material Facts ("Def.'s Rule 56.1 Resp."); R. 72, Defendant/Counter Claimant's Statement of Additional Material Facts ("Def.'s Add'l Facts"); R. 75, Plaintiffs/Counter Defendants' Response to Defendant/Counter Claimant's Statement of Additional Material Facts ("Pls.' Resp. Add'l Facts").)

[3]  Mezzanine financing is debt capital that gives the lender the rights to convert to an ownership or equity interest in the company if the loan is not paid back in time and in full. It is generally subordinated to debt provided by senior lenders, such as banks and venture capital companies. *Mezzanine Financing Definition*, INVESTOPEDIA, http://www.investopedia.com/terms/m/mezzaninefinancing.asp (last visited July 16, 2015).

Property, LLC (D/B/A Hotel 71) (hereafter, the "CBA"). (*Id.* ¶ 10.) As part of the CBA, Chicago H&S was required to make pension contributions on behalf of union employees to what was then the HEREIU Pension Fund. (*Id.* ¶ 11.)

## II. Chicago H&S files for bankruptcy

Chicago H&S eventually ran into financial difficulties, and in 2007, it defaulted on both the senior and mezz loans. (*Id.* ¶ 13.) Numerous parties accused Chicago H&S's owners of fraud and other criminal activities. (*Id.* ¶ 14.) Chicago H&S faced "imminent" foreclosure by its senior mortgage lender. (*Id.* ¶ 16.) In early October 2007, following the default, Mezz Lender conducted a foreclosure sale of its collateral—the membership interest in Chicago H&S— pursuant to Article 9 of the Uniform Commercial Code (UCC), and Mezz Lender became the owner of Chicago H&S. (*Id.* ¶ 17.) Mezz Lender appointed Patrick O'Malley, Chief Financial Officer of Developmental Specialists, Inc., a Chicago-based restructuring firm, as the Chief Restructuring Officer. (*Id.* ¶ 19-20.) On October 29, 2007, at O'Malley's direction, Chicago H&S filed a Chapter 11 petition in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"). (*Id.* ¶ 22-23.) The purpose of filing for bankruptcy relief was to stabilize Hotel 71, resolve numerous mechanic lien claims, and conduct a going-concern sale of the hotel.[4] (*Id.* ¶ 24.)

## III. The bankruptcy proceedings and plan

Chicago H&S filed a reorganization plan with the Bankruptcy Court. (*Id.* ¶ 26.) The Honorable Eugene R. Wedoff presided over the hearing regarding confirmation of the reorganization plan over several days in March 2008. (R. 75, Pls.' Resp. Add'l Facts ¶ 4.) The

---

[4] "Going concern" is a term for a company that has the resources needed to continue operations indefinitely. In other words, this refers to a company's ability to make enough money to stay afloat or avoid bankruptcy. *Going Concern Definition*, INVESTOPEDIA, http://www.investopedia.com/terms/g/goingconcern.asp (last visited July 16, 2015).

proposed plan was heavily negotiated and contested by multiple parties-in-interest, including Chicago H&S, its senior mortgage lender, its official committee of unsecured creditors, multiple mechanics' lien claimants, and Plaintiffs. (R. 72, Def.'s Rule 56.1 Resp. ¶ 27.) Objectors to the proposed plan were concerned over the scope of a release contained in Section 13.1. (R. 75, Pls.' Resp. Add'l Facts ¶ 5.) Specifically, objectors were concerned that the proposed plan could be interpreted as releasing third-party claims. (*Id.* ¶ 6.) On the second day of the hearing, Judge Wedoff acknowledged that the Seventh Circuit had just issued *In re Airadigm Communications, Inc.*, 519 F.3d 640 (7th Cir. 2008), in which it held that third-party non-debtor releases are permissible in limited circumstances. (*Id.* ¶ 6.) However, Daniel Zazove, an attorney representing Chicago H&S during the bankruptcy proceedings, repeatedly made representations to the court that the proposed plan did not contain any third-party releases. (*Id.* ¶¶ 10, 17, 19.) In addition, withdrawal liability claims were not mentioned during the proceedings by the plan proponents, objectors, or the Judge. (*Id.* ¶ 21.) At the conclusion of the hearings, on March 21, 2008, the Bankruptcy Court confirmed the Plan. (R. 72, Def.'s Rule 56.1 Resp. ¶ 26.)

Section 13.1 of the Plan provides:

> The distributions to be received by creditors, or contemplated, under this Plan are in full and final satisfaction and settlement of any and all Claims arising in connection with Debtor's Chapter 11 case that such creditors may have against the Releasees, the Debtor's estate, the estate assets and the assets contemplated under this Plan to satisfy Claims, and all such claims are released. For the avoidance of doubt, nothing in this section is intended, or shall be construed, to release, modify or otherwise affect any direct claim or direct cause of action that creditors have, or might have, against any third parties that arose prior to the Petition Date.

(*Id.* ¶ 41; R. 71-5, Ex. 5, Plan § 13.1.) Section 13.4 of the Plan provides an injunction barring claims involving any matter that has been released under Section 13.1:

> ***Except as otherwise provided herein, from and after the Effective Date, all holders of Claims shall be permanently enjoined from commencing or***

5

*continuing in any manner, any suit, action or other proceeding, on account of any Claim, Interest, obligation, debt, right, cause of action, remedy or liability released or to be released pursuant to the Plan or against any asset of the Debtor's estate which is subject to administration to pay Claims and Interests.*

(R. 75, Pls.' Resp. Add'l Facts ¶ 26; R. 71-5, Ex. 5, Plan § 13.4.) The Plan defines the

"Releasees" as "the Debtor, its current owner and any officers, members and managers of its

current owner, any professional retained by the current owner, the Trustee, Canyon/Brickman,

(except as to claims of the Trustee) the Committee and any professional retained by the

Committee." (R. 72, Def.'s Rule 56.1 Resp. ¶ 42; R. 71-5, Ex. 5, Plan at 9.) Further, the Plan

defines "Claim" as:

> (a) a right to payment whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

(R. 75, Pls.' Resp. Add'l Facts ¶ 24; R. 71-5, Ex. 5, Plan at 6.) The Plan also specifies that a

"term used but not defined in the Plan shall have the meaning ascribed to that term in the

Bankruptcy Code[.]" (R. 75, Pls.' Resp. Add'l Facts ¶ 25; R. 71-5, Ex. 5, Plan at 4.)

In addition, the Plan provided for the auction sale of Hotel 71 free and clear of liens on a

fully operational "going concern" basis. (R. 72, Def.'s Rule 56.1 Resp. ¶ 28.) The Plan also

provided for an orderly distribution of Chicago H&S's assets, including the proceeds of the sale,

to creditors holding allowed secured and unsecured claims. (*Id.* ¶ 29.)

## IV.  The sale of Hotel 71

On the date of the Plan's confirmation, the court also approved the sale of Hotel 71 to its

senior mortgage lender, subject to certain conditions delineated in the Plan, including the

assumption of the CBA and the funding of payments for unsecured claimants.[5] (*Id.* ¶ 30.) Four

months later, in July 2008, the sale of Hotel 71 closed. (*Id.* ¶ 31.) The contract for the sale of

Hotel 71 did not meet any of the statutory requirements of 29 U.S.C. § 1384. (R. 75, Pls.' Resp.

Add'l Facts ¶ 27.) Specifically, the sale contract did not require the purchaser to furnish a bond

or place funds in escrow for a period of five years in the event that the purchaser incurred any

future withdrawal liability. (*Id.*) The contract for the sale also did not provide that Chicago

H&S would be secondarily liable if the purchaser failed to pay its withdrawal liability, should

any be incurred. (*Id.*)

Mezz Lender agreed to subordinate its claim of more than $27 million to the claims of

other unsecured creditors, and thus received no payment from the proceeds of the sale. (R. 72,

Def.'s Rule 56.1 Resp. ¶ 38-39.) Pursuant to the Plan, the senior mortgage lender (the purchaser)

agreed to assume the CBA and several other executory contracts to which Hotel 71 was a party.

---

[5] NRF argues that Chicago H&S's Chapter 11 reorganization constituted a complete withdrawal
under ERISA because the assignment of the CBA resulted in a permanent cessation of Chicago
H&S's obligation to contribute to the pension fund. (R. 73, Def.'s Resp. at 4-5.) *See* 29 U.S.C.
§ 1383(a). Chicago H&S's reorganization also involved the sale of Hotel 71. Under ERISA, an
employer that ceases to have an obligation to contribute to a pension fund, because of a bona
fide, arm's-length sale of assets, does not incur withdrawal liability if certain conditions are met.
29 U.S.C. § 1384(a)(1). First, the buyer must assume an obligation to make contributions to the
plan at substantially the same level as the seller's contribution. 29 U.S.C. § 1384(a)(1)(A).
Second, the purchaser must provide to the plan a bond or escrow account for five plan years
commencing with the first plan year beginning after the sale of assets. 29 U.S.C. §
1384(a)(1)(B). Finally, the contract for sale must provide that, if the buyer fully or partially
withdraws in the five years following the sale and does not pay withdrawal liability, the seller is
secondarily liable for the fee. 29 U.S.C. § 1384(a)(1)(C).

(*Id.* ¶ 32.) Chicago H&S sent a notice of assumption and assignment of the executory contracts to the contracting parties, including the Chicago Executive Board of UNITE HERE. (*Id.* ¶ 33.) Chicago H&S also submitted a "cure notice" that specified the amounts necessary to cure any defaults incurred prior to the senior mortgage lender's assumption of the executory contracts. (*Id.* ¶ 34.) The cure amount for Chicago H&S's contributions to the CBA was listed as $0. (*Id.*; R. 71-6, Ex. A, Cure Notice at 15.) The senior mortgage lender and the hotel's current owner, CVOF 71 LLC, have made all required payments under the CBA since the sale closed in 2008. (R. 72, Def.'s Rule 56.1 Resp. ¶ 38.)

## V.    NRF asserts withdrawal liability against Chicago H&S and Plaintiffs

During the course of the bankruptcy proceedings and subsequent sale of Hotel 71, NRF received notice of several important events, including: (1) the hearing to confirm the Plan; (2) the entry of the Order confirming the Plan; (3) the cure notice for assumed contracts; (4) the sale of the Hotel 71; and (5) the hearing to confirm the sale. (*Id.* ¶ 45.) NRF did not file any objection to the Plan, nor did it meaningfully participate in the bankruptcy proceedings. (*Id.* ¶ 46.) Prior to the confirmation of the Plan, on February 13, 2008, NRF's predecessor filed a proof of claim contingent upon any withdrawal liability incurred by the dissolution of Chicago H&S. (*Id.* ¶ 47; R. 72-1, Ex. 4, Proof of Claim 94 at 108.) On October 16, 2008, Chicago H&S contested the claim for withdrawal liability. (R. 72, Def.'s Rule 56.1 Resp. ¶ 51; R. 75, Pls.' Resp. Add'l Facts ¶ 28; *see* R. 72-1, Ex. 10, Debtor's Objection to the Claims of HEREIU Welfare Fund & UNITE HERE National Retirement Fund at 496.) On November 10, 2008, NRF's predecessor filed an amended proof of claim, contending that the sale of Hotel 71 triggered withdrawal liability in the amount of $1,222,022.33. (R. 72, Def.'s Rule 56.1 Resp. ¶¶ 48-49; R. 75, Pls.' Resp. Add'l Facts ¶ 29; R. 72-1, Ex. 5, Amended Proof of Claim 94 at 110-115.) In August

8

2009, after a series of negotiations, NRF settled its withdrawal liability claim with Chicago H&S by reducing its initial unsecured claim of $1,222,022.23 to a general unsecured claim in the amount of $550,000.00. (R. 75, Pls.' Resp. Add'l Facts ¶ 30; R. 71-8, Ex. 8, Stipulation Resolving Objection to the Claims of UNITE HERE National Retirement Fund.) The stipulation explicitly noted that Chicago H&S did not admit to the existence of any withdrawal liability. (R. 72, Def.'s Rule 56.1 Resp. ¶ 53.)

Following the sale of Hotel 71, NRF received distributions for its unsecured claim in the amounts of $44,969.02 on June 21, 2011, and $23,974.38 on May 3, 2013. (*Id.* ¶ 54.) On April 1, 2013, nearly five years after the sale of Hotel 71, NRF submitted a letter to Mezz Lender asserting that it and all other trades or businesses under common control with Chicago H&S were jointly and severally liable for the unpaid portion of Chicago H&S's withdrawal liability. (R. 72, Def.'s Rule 56.1 Resp. ¶ 55; R. 75, Pls.' Resp. Add'l Facts ¶ 31; R. 71-9, Ex. 9, NRF's Demand Letter.) In its letter, NRF demanded payment of withdrawal liability in the total amount of $2,169,754—the final calculation of withdrawal liability, plus interest, less the $44,969.02 installment payment NRF had received to date. (R. 75, Pls.' Resp. Add'l Facts ¶ 32; R. 71-9, Ex. 9, NRF's Demand Letter.) Further, NRF requested that Mezz Lender and/or members of its alleged controlled group make 43 quarterly installments of $71,258.77 each to commence on May 1, 2013, plus a final payment of $11,046.65. (R. 72, Def.'s Rule 56.1 Resp. ¶ 56; R. 75, Pls.' Resp. Add'l Facts ¶ 32; R. 71-9, Ex. 9, NRF's Demand Letter.) Mezz Lender responded by letter on April 18, 2013, contending that Section 13.1 of the Plan released NRF's withdrawal liability claim against Mezz Lender and Oaktree. (R. 72, Def.'s Rule 56.1 Resp. ¶ 57; R. 71-10, Ex. 10, Mezz Lender's Resp.) Mezz Lender also argued that Section 13.4 of the Plan enjoins

NRF from seeking to collect any withdrawal liability from any member of Chicago H&S's Controlled Group. (R. 72, Def.'s Rule 56.1 Resp. ¶ 57; R. 71-10, Ex. 10, Mezz Lender's Resp.) Mezz Lender did not pay its first installment on May 1, 2013; however, it has made quarterly payments of $71,258.77 since June 2013. (R. 72, Def.'s Rule 56.1 Resp. ¶ 60.) As of May 2015, Mezz Lender has paid NRF $641,328.93. (*Id.* ¶ 60.)

## PROCEDURAL HISTORY

Plaintiffs initiated this action on May 1, 2013. (R. 1, Compl.) As stated above, Plaintiffs seek a declaration that Section 13.1 of the Plan released any claim against Plaintiffs and the Controlled Group for withdrawal liability. (*Id.* at 8.) In addition, Plaintiffs seek a declaration that Section 13.4 of the Plan enjoins NRF from asserting a withdrawal liability claim against Plaintiffs and the Controlled Group. (*Id.*) On May 28, 2013, NRF answered Plaintiffs' complaint and, adding Trustees as counter claimants, filed a counterclaim alleging that Mezz Lender and the Controlled Group are jointly and severally liable for withdrawal liability incurred by Chicago H&S's Chapter 11 reorganization. (R. 20, Def.'s Answer & Countercl. at 15-17.)

On June 27, 2013, Plaintiffs moved for summary judgment. (R. 27, Pls.' Mot. Summ. J.) NRF and Trustees filed a cross-motion for summary judgment on July 19, 2013. (R. 34, Def.'s Mot. Summ. J.) This Court granted Plaintiffs' summary judgment motion, deciding that Plaintiffs were not jointly and severally liable for any withdrawal liability incurred by Chicago H&S's Chapter 11 reorganization. (R. 42, Mem. Op. & Order at 16.) The Court did not reach the issue of whether the Plan released NRF's withdrawal liability claim, and therefore declined to issue Plaintiffs' requested declaratory relief. (*Id.*) NRF filed a motion for reconsideration pursuant to Federal Rule of Civil Procedure 59(e), (R. 44, Def.'s Mot. Reconsider), which the Court denied in open court on April 8, 2014, (R. 46, Min. Entry). NRF subsequently appealed to

the Seventh Circuit on May 8, 2014. (R. 48, Notice of Appeal.) The Seventh Circuit ruled that this Court "erred in granting summary judgment to [Plaintiffs] on the question of whether Mezz Lender constitutes a trade or business for purposes of withdrawal liability." *Hotel 71 Mezz Lender*, 778 F.3d at 607. The Seventh Circuit vacated this Court's judgment and remanded for further proceedings. *Id.* Upon remand, on April 10, 2015, Plaintiffs again moved for summary judgment, seeking the same declaratory judgment. (R. 69, Pls.' Renewed Mot. Summ. J.) NRF responded on May 8, 2015, (R. 73, Def.'s Resp.), and Plaintiffs replied on May 22, 2015, (R. 76, Pls.' Reply). Neither party has requested further discovery before responding to the new pending motion.

## LEGAL STANDARD

Summary judgment is appropriate if, construing all facts and drawing all inferences in favor of the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Jajeh v. Cnty. of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). "A disputed fact is 'material' if it might affect the outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A genuine issue of material fact exists only if there is evidence to permit a jury to return a verdict for the nonmoving party. *Id.* Courts neither judge the credibility of witnesses nor evaluate the weight of the evidence when addressing a summary judgment motion. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (citation omitted). However, Rule 56 "mandates the

11

entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ANALYSIS

Plaintiffs move for summary judgment on the basis that the Plan releases and enjoins NRF's claim for withdrawal liability against Plaintiffs and its Controlled Group. (R. 69, Pls.' Renewed Mot. Summ. J. at 2.) Before proceeding to the issues raised in the parties' pleadings, a brief overview of the relevant statutory framework is helpful.

Under ERISA, the Pension Benefit Guaranty Corporation ("PBGC"), a government corporation, "protects covered employees by insuring their benefits against insolvency or termination of their pension funds." *Cent. States Se. & Sw. Areas Pension Fund v. Messina Prods., L.L.C.*, 706 F.3d 874, 878 (7th Cir. 2013). Prior to the 1980s, ERISA's contingent liability provisions provided employers "a perverse incentive to withdraw from financially weak multiemployer plans to avoid liability in the event the plan terminated in the future." *Id.* "As a result, the PBGC reported to Congress that the premiums paid to it were insufficient to cover its expected future liabilities." *McDougall v. Pioneer Ranch Ltd. P'ship*, 494 F.3d 571, 574 (7th Cir. 2007). To counteract the incentive for voluntary withdrawals, the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1461, amended ERISA by imposing mandatory liability on all withdrawing employers for their proportionate shares of "unfunded vested benefits." [6] *Id.* (quoting 29 U.S.C. § 1381). But Congress went further, including in the MPPAA a provision that all "'trades or businesses' under 'common control'

---

[6] The Supreme Court has defined "unfunded vested benefits" as "the difference between the present value of vested benefits and the current value of the plan's assets." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984) (citing 29 U.S.C. §§ 1381, 1391).

12

with the withdrawing employer are treated as a single entity for purposes of assessing and collecting withdrawal liability." *Messina Prods.*, 706 F.3d at 878 (citing 29 U.S.C. § 1301(b)(1); *Cent. States, Se. & Sw. Areas Pension Fund v. Neiman*, 285 F.3d 587, 594 (7th Cir. 2002)). "Each trade or business found to be under common control is jointly and severally liable for any withdrawal liability of any other[,]" the purpose of which is "to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities[.]" *Id.* (citation omitted).[7]

Here, NRF argues that the sale of Hotel 71 did not satisfy ERISA's requirements for an asset sale under 29 U.S.C. § 1384. (R. 73, Def.'s Resp. at 3, 14.) As discussed above, under Section 1384, an employer's bona fide, arm's-length sale of assets to an unrelated party does not trigger withdrawal liability if the sale meets certain requirements set forth in the statute. 29 U.S.C. § 1384(a)(1); *see also Cent. States v. Ga.-Pacific L.L.C.*, 639 F.3d 757, 759 (7th Cir. 2011) (discussing the requirements of an asset sale under ERISA). Due to the failure of the sale to meet all of the statutory requirements, NRF argues that the sale of Hotel 71 triggered withdrawal liability not just for Chicago H&S, but for its owners (Plaintiffs) and members of their Controlled Group. (R. 73, Def.'s Resp. at 4.) Plaintiffs admit that the sale of Hotel 71 did not meet ERISA's requirements for an asset sale. (R. 75, Pls.' Resp. Add'l Facts ¶ 27.) However, Plaintiffs argue that the terms of the Plan release NRF's withdrawal liability claims

---

[7] Plaintiffs deny that Chicago H&S incurred any withdrawal liability. (R. 70, Pls.' Mem. at 2, n.1.) Thus, Plaintiffs also deny that they or any related entities are subject to any "controlled-group liability" under ERISA. (*Id.*) However, Plaintiffs have decided to forego raising the issue of controlled-group liability at this juncture, correctly reasoning that if this Court determines that the Plan releases and enjoins NRF from brining any withdrawal liability claims, the controlled-group liability issue is moot. (*Id.*) *See Hotel 71*, 778 F.3d at 607 (the court acknowledges that there is "no dispute that if the Oaktree parties' position on [the Plan] is correct, it would be unnecessary to decide whether or not Mezz Lender constitutes a trade or business."). Accordingly, for the purpose of this analysis, the Court assumes without deciding that Plaintiffs and its Controlled Group have incurred withdrawal liability.

against them, and enjoin NRF from asserting its claims against them or its Controlled Group. (R. 70, Pls.' Mem. at 8.) NRF opposes such an interpretation of the Plan on various grounds, including that the Plan's release contains a "carve-out" provision that permits NRF to assert its claims and that Plaintiffs' interpretation of the release violates both ERISA and Seventh Circuit precedent. (R. 73, Def.'s Resp. at 6-15.) Accordingly, the Court begins its analysis by determining whether the Plan does, in fact, release NRF's claims.

## I. Whether NRF's withdrawal liability claims fall within the scope of the Plan's release provision

The first sentence of Section 13.1 of the Plan contains a release, which provides that:

The distributions to be received by creditors, or contemplated, under this Plan are in full and final satisfaction and settlement of any and all Claims arising in connection with Debtor's Chapter 11 case that such creditors may have against the Releasees, the Debtor's estate, the estate assets and the assets contemplated under this Plan to satisfy Claims, and all such claims are released.

(R. 71-5, Ex. 5, Plan § 13.1.)[8] Plaintiffs argue that this sentence releases NRF's withdrawal liability claims against them. (R. 70, Pls.' Mem. at 9.) NRF argues that Plaintiffs' interpretation of the release is overly broad and misconstrues the intent of ERISA to hold each trade or business liable for Chicago H&S's withdrawal. (R. 73, Def.'s Resp. at 8.)

"Principles of contract law apply to interpreting a plan of reorganization." *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 664 (7th Cir. 2010) (citation omitted). Section 1.3 of the Plan states explicitly that it is to be "construed and enforced in accordance with[] the laws of the State of Illinois," (R. 71-5, Ex. 5, Plan § 1.3), and therefore the Court will apply Illinois rules of contract interpretation. Under Illinois law, the goal of contract interpretation is to ascertain

---

[8] As referenced above, the Plan defines "Releasees" as "the Debtor, its current owner and any officers, members and managers of its current owner, any professional retained by the current owner, the Trustee, Canyon/Brickman, (except as to claims of the Trustee) the Committee and any professional retained by the Committee." (R. 71-5, Ex. 5, Plan at 9.)

the parties' intent, and in so doing, the Court first looks to "the plain and ordinary meaning" of the contract language. *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007) (citation omitted); *see also Burford v. Accounting Practice Sales, Inc.*, 786 F.3d 582, 585 (7th Cir. 2015) (applying Illinois law). The Court must construe the contract "as a whole, viewing each part in light of the others." *Gallagher*, 874 N.E.2d at 58 (citation omitted). "The terms should be construed so that the contract is 'fair, customary, and such as prudent persons would naturally execute,' and is 'rational and probable.'" *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) (quoting *Foxfield Realty, Inc. v. Kubala*, 678 N.E.2d 1060, 1063 (Ill. App. Ct. 1997)). When a contract is "clear and explicit, a court must enforce the agreement as written." *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984). "However, if the language of the contract is susceptible to more than one meaning, it is ambiguous, [and] a court can consider extrinsic evidence to determine the parties' intent." *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) (internal citation omitted); *see also Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (applying Illinois law).

The parties do not dispute that Plaintiffs are releasees under the terms of the Plan,[9] nor do they dispute that NRF is a creditor who received distributions under the Plan. They also agree that NRF's withdrawal liability claim falls within the meaning of "Claim" as defined by the Plan. However, the parties' agreement as to the meaning of the release terms ends here. NRF argues

---

[9] The Plan grants releasee status to the debtor and its current owner. (R. 71-5, Ex. 5, Plan at 9.) This clearly qualifies Mezz Lender as a release as Mezz Lender is the owner of Chicago H&S. Implicit in both parties' pleadings is the presumption that Oaktree, as the owner of Mezz Lender, also qualifies as a releasee. The Court agrees. The term "owner" is defined as "[s]omeone who has the right to possess, use, and convey something; a person in whom one or more interests are vested." *Black's Law Dictionary* 1137 (8th ed. 2004). As the owner of Mezz Lender, Oaktree would have had the right to possess, use, or convey Chicago H&S. Therefore, giving the Plan a "fair" and "rational" reading, Oaktree is an owner of Chicago H&S within the meaning of the Plan, and also qualifies as a releasee. *Utility Audit*, 383 F.3d at 687 (citation omitted).

15

that their claims against Plaintiffs did not arise "solely" in connection with Chicago H&S's

Chapter 11 case, and therefore its claim is not released by the Plan. (R. 73, Def.'s Resp. at 9.)

Specifically, NRF asserts that its withdrawal liability claim arose when Mezz Lender became

owner of Chicago H&S, and "matured" as a result of the sale of Hotel 71. (*Id.*) NRF does not

point to any case law or statute to support its assertion that its claim arose when Mezz Lender

became the owner of Chicago H&S. Nonetheless, NRF clearly identifies the sale of Hotel 71 as

the event that triggered its withdrawal liability claim. (R. 73, Def.'s Resp. at 3; R. 75, Pls.' Resp.

Add'l Facts ¶ 27; *see* 29 U.S.C. § 1383(d)(3)(B)(ii).) It is undisputed that this sale occurred as

the result of the Chapter 11 reorganization of Chicago H&S. (R. 72, Def.'s Rule 56.1 Resp. ¶¶

28, 30.) Therefore, under even the strictest interpretation of the phrase, NRF's withdrawal

liability claim arose "in connection" with Chicago H&S's bankruptcy case. The distinction that

NRF asserts between when the claim "arose" and "matured" simply cannot supplant the clear

and unambiguous language of the Plan. Thus, under the plain language of the Plan, NRF's

withdrawal liability claim arose "in connection with [Chicago H&S's] Chapter 11 case[.]" (R.

71-5, Ex. 5, Plan § 13.1.) Therefore, the Court finds that the release provision in Section 13.1

applies to NRF's claims against Plaintiffs.

 Seeking to avoid this result, NRF argues that because ERISA treats each trade or business

under common control with an employer as a single employer, *see* 29 U.S.C. § 1301(b),

Plaintiffs and its Controlled Group are "independently liable" for Chicago H&S's withdrawal,

and therefore the Plan does not release NRF's claims. (R. 73, Def.'s Resp. at 8 (citing *I.A.M.*

*Nat'l Pension Fund v. TMR Realty Co.*, 431 F. Supp. 2d 1, 25 (D.D.C. 2006)).) Plaintiffs

counter that NRF's interpretation of the release is at odds with the plain meaning of Section 13.1.

(R. 76, Pls.' Reply at 2.)

NRF relies on *TMR Realty* in support of the argument that because controlled group members are jointly and severally liable, any withdrawal liability claims asserted against them are direct claims that are separate from the bankruptcy case, and therefore cannot be released by a bankruptcy plan. (R. 73, Def.'s Resp. at 8.) Unfortunately, Plaintiffs' reliance on *TMR Realty* is misplaced for a number of reasons. In *TMR Realty*, the plaintiffs, a pension fund and its trustees, sought to hold the defendants jointly and severally liable for the withdrawal liability assessed by the fund against a non-party employer, on the basis that defendants were are all members of the same controlled group as the non-party employer. 431 F. Supp. 2d at 2. Like Chicago H&S, the non-party employer in *TMR Realty* had undergone Chapter 11 reorganization, and the bankruptcy plan released plaintiffs' withdrawal liability claim against it. *Id.* at 7-8. The defendants argued that the bankruptcy plan also released the plaintiffs' withdrawal liability claims against them. *Id.* at 23. The court ultimately found that the bankruptcy plan did not release the plaintiffs' withdrawal liability claims against the defendants.[10] *Id.* at 24-25.

However, *TMR Realty* is factually dissimilar from the instant case in several respects. First, the release in *TMR Realty* was narrower and more specific than the release in Section 13.1. The release in *TMR Realty* only released a specific subset of claims as defined by the

---

[10] The *TMR Realty* court's conclusion that the release of an employer's withdrawal liability under a bankruptcy reorganization plan does not release the withdrawal liability of non-debtor controlled group members was based upon its reading of the reorganization plan, Section 524(e) of the Bankruptcy Code, and relevant case law from the D.C. Circuit and Fourth Circuit. 431 F. Supp. 2d at 24-25; *see also I.A.M. Nat'l Pension Fund, Plan A, A Benefits v. Slyman Indus., Inc.*, 901 F.2d 127, 129 (D.C. Cir. 1990); *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 121-22 (4th Cir. 1991); *McDonald v. Centra, Inc.*, 946 F.2d 1059, 1065 (4th Cir. 1991). Section 524(e) of the Bankruptcy Code provides, in pertinent part, that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt[.]" 11 U.S.C. § 524(e). As the Court will discuss later in this opinion, the Seventh Circuit has permitted the release of claims against non-debtors in bankruptcy reorganization plans in limited circumstances. *See Airadigm*, 519 F.3d at 657. However, at this juncture, the Court is only addressing the issue of whether the release of NRF's withdrawal liability claims violates the plain language of the Plan.

reorganization plan, which did not include the plaintiffs' withdrawal liability claims against the defendants. In fact, the plaintiffs had not filed a proof of claim against the defendants at the time of the reorganization proceedings; thus, the reorganization plan could not have been read to release the plaintiffs' withdrawal liability claims against the defendants. Conversely, the release in Section 13.1 is much broader in scope, as it does not limit the release of claims to any specific type or class of claims. (*See* R. 71-5, Ex. 5, Plan § 13.1.) Rather, it releases *all claims* "arising in connection with [Chicago H&S's] Chapter 11 case[.]" (*Id.*) Therefore, the *TMR Realty* court's analysis on this issue is not particularly persuasive. As a result, NRF's claims against Plaintiffs fall within the scope of the Plan's release provision.

## II. Whether Section 13.1 exempts NRF's withdrawal claims from release

The second sentence of Section 13.1 contains a "carve-out" provision clarifying that certain types of claims are not released by the Plan. (*See* R. 71-5, Ex. 5, Plan § 13.1.) The carve-out provision states that: "For the avoidance of doubt, nothing in this section is intended, or shall be construed, to release, modify or otherwise affect any direct claim or direct cause of action that creditors have, or might have, against any third parties that arose prior to the Petition Date."[11] (*Id.*)

NRF argues that even if their withdrawal liability claims fall within the scope of the release, the carve-out provision exempts their withdrawal liability claims from the release. (R. 73, Def.'s Resp. at 6.) Plaintiffs argue that NRF's claims did not arise prior to the filing of the

---

[11] As referenced above, the Plan specifies that a "term used but not defined in the Plan shall have the meaning ascribed to that term in the Bankruptcy Code[.]" (R. 71-5, Ex. 5, Plan at 4.) Although the Plan defines "Claim" with a capital letter, the carve-out provision contains the term "claim" which is undefined. The Plan's definition of "Claim" is substantially similar to the Bankruptcy Code's definition of "claim." *See* 11 U.S.C. § 101(5). However, to the extent there is any conflict between the two, the Bankruptcy Code's definition of claim will apply to the Court's analysis of the carve-out provision.

18

bankruptcy petition ("pre-petition"), as required in order for the provision to be applicable, and therefore their claims are not carved out of the release. (R. 70, Pls.' Mem. 9-10; R. 76, Pls.' Reply at 3-6.)

There is limited case law in this Circuit discussing whether withdrawal liability claims arise pre- or post-petition. The Seventh Circuit has held that withdrawal liability "attaches only when the employer 'completely withdraws' from the multiemployer plan which occurs only when [it] either '(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan.'" *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 917 (7th Cir. 2001) (quoting 28 U.S.C. § 1383(a)) (internal citation omitted). The court reasoned that insolvency alone is not enough to trigger withdrawal liability, as "[a]n insolvent firm is not necessarily out of business, and the parties with which it has contracts cannot automatically assume that the firm will default[.]" *Id.* (citation omitted). The court relied, in part, on the PBGC's guidance letter on this issue. *See id.* The PBGC stated that "if the withdrawal is based on a permanent cessation of the obligation to contribute, the date of withdrawal is the date when the obligation to contribute ceased." PBGC Opinion Letter 87-1, 1987 WL 68403, at *1 (PBGC Jan. 23, 1987). Although the court was determining at when withdrawal liability claim first accrues for purposes of calculating whether the statute of limitations had passed, the Court nonetheless finds its reasoning instructive in this context.

Given the lack of Seven Circuit cases on the issue, the parties each cite to cases from other circuits in support of their respective positions. NRF cites to various cases holding that withdrawal liability claims are "pre-petition" claims even when the withdrawal event occurs post-petition. (R. 73, Def.'s Resp. at 7.) *See Trs. of Amalgamated Ins. Fund v. McFarlin's, Inc.*,

19

789 F.2d 98, 104 (2d Cir. 1986) (finding that withdrawal liability is a pre-petition claim because the employees performed the work that entitled them to their pension benefits prior to the filing of the bankruptcy petition); *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 318 (3d Cir. 2011) (explaining that "unfunded vested benefits from which withdrawal liability is calculated are benefits which are promised and earned but not yet funded as of the calculation day[,]" and concluding that "[t]he liability for unfunded vested benefits represents a pre-existing obligation on the employer's part, and is not simply 'incurred' as of the date of withdrawal." (internal alterations and citation omitted)); *In re Silver Wheel Freightlines, Inc.*, 57 B.R. 476, 478-79 (Bankr. D. Or. 1985) (classifying withdrawal liability claim as "a pre-petition, unsecured claim" because the pension fund had an "unmatured right" to payment contingent upon the debtor's cessation of business).

    Plaintiffs argue that the holdings in these cases are inapplicable to the instant case. (R. 76, Pls.' Reply at 5-6.) Plaintiffs are correct that the central issue in each case was whether a withdrawal liability claim could be asserted as an administrative expense and therefore entitled to priority in bankruptcy. *See* 11 U.S.C. § 503(b)(1)(A).[12] In *McFarlin's*, the court held that a withdrawal liability claim was not entitled to administrative priority because the consideration supporting the claim was the work of the debtor's employees during the pre-petition period. 789 F.2d at 103-04. The court did not analyze whether a withdrawal liability claim arises pre-petition. Similarly, the *Marcal* court considered whether the portion of withdrawal liability incurred after an employer filed a Chapter 11 petition constituted an administrative expense entitled to priority under the Code. *Marcal*, 650 F.3d at 313. The court held that withdrawal

---

[12] Section 503(b)(1)(A) sets forth a myriad of costs that qualify as administrative expenses under the Bankruptcy Code. Covered expenses include "the actual, necessary costs and expenses of preserving the estate including . . . wages, salaries, and commissions for services rendered after the commencement of the [bankruptcy] case." 11 U.S.C. § 503(b)(1)(A).

liability may be apportioned between pre- and post-petition periods, and that the post-petition amount may be considered an administrative expense under the Code. *Id.* at 317. The court reasoned that "to the extent that a portion of the benefits correlate to the employees' post-petition service, the benefit is akin to direct compensation provided in exchange for post-petition services, which undisputedly qualifies as an administrative expense." *Id.* at 318. Again, this does not precisely answer the question of whether a withdrawal liability claim arises pre- or post-petition. The *Silver Wheel* court was unequivocal in its assertion of withdrawal liability as a pre-petition claim, but did not provide a lengthy explanation for the basis of this finding. 57 B.R. at 479. Therefore, the Court finds NRF's cited case law useful, but not determinative on this issue.

Plaintiffs cite to *CPT Holdings, Inc. v. Industrial & Allied Employees Union Pension Plan, Local 73*, 162 F.3d 405 (6th Cir. 1998), in support of their position that withdrawal liability is a post-petition claim. (R. 70, Pls.' Mem. at 10; R. 76, Pls.' Reply at 4.) In *CPT Holdings*, the debtor withdrew from its pension plan 22 months after its Chapter 11 plan was confirmed. 162 F.3d at 406. The pension plan sought to impose withdrawal liability on the debtor, and the debtor argued that any withdrawal liability had been discharged by the confirmation of the reorganization plan. *Id.* The question before for the court was "whether a 'claim' exists at confirmation where an employer assumes a plan's funding obligations during Chapter 11 proceedings, but does not withdraw until well after confirmation of the reorganization plan." *Id.* at 407. The court held that a "claim" for withdrawal liability "cannot exist prior to withdrawal." *Id.* at 409. The court explained that, in contrast to an employer's failure to satisfy monthly or annual funding requirements, which would give rise to an immediate right to payment by the plan, "withdrawal liability is premised on an employer's proportionate share of unfunded vested benefits *at the time of withdrawal.*" *Id.* at 407 (citing 29 U.S.C. § 1393(c)).

Therefore, the court concluded that "[w]ithdrawal liability is not a 'claim' prior to confirmation [of a reorganization plan]." *Id.* at 409.

NRF argues that *CPT Holdings* is inapplicable in this case because it is contrary to the Bankruptcy Code, which specifically permits the recovery of claims that are contingent on future occurrences. (R. 73, Def.'s Resp. at 8, n.7 (citing 11 U.S.C. § 101(5)(A)).) However, the Sixth Circuit recognized that the Bankruptcy Code provided for contingent claims, but found that "relevant non-bankruptcy law must be examined to see whether a right to payment, even a contingent right, exists." *CPT Holdings*, 162 F.3d at 409. The court specifically identified the relevant non-bankruptcy law as ERISA, and found that "a mere pre-petition legal relationship between a creditor and a debtor, without more, is insufficient to create a pre-petition right to payment." *Id.* (quoting *In the Matter of United Merchs. & Mfrs., Inc.*, 166 B.R. 234, 237 (Bankr. D. Del. 1994)) (internal alterations omitted). The court concluded that under ERISA and the MPPAA "[a] multiemployer pension plan has no enforceable right to payment for withdrawal liability until an employer actually withdraws from a plan, leaving the plan underfunded. Since this may never occur, it cannot be said that a legal right to payment exists prior to withdrawal." *Id.* This Court finds that the Sixth Circuit adequately considered the Bankruptcy Code and its duty to "harmonize" the Code with ERISA. *Marcal*, 650 F.3d 320; *see also Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("The Courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."). Thus, the *CPT Holdings* court's decision is not in violation of the Bankruptcy Code and is applicable in the instant case.

NRF also argues that *CPT Holdings* conflicts with Seventh Circuit precedent but does not identify the precedent to which it is referring. (R. 73, Def.'s Resp. at 8, n.7.) Neither party the could point to any Seventh Circuit case law that directly addresses the issue of whether a withdrawal liability claim under ERISA arises pre- or post-petition, and the Court found none in its independent research. Therefore, there can be no direct conflict between *CPT Holdings* and any Seventh Circuit precedent. In addition, the Court disagrees with NRF's argument because the Seventh Circuit's position on withdrawal liability announced in *Basic American* appears entirely consistent with the Sixth Circuit's decision in *CPT Holdings*. Although the Sixth and Seventh Circuits were addressing the issue in different contexts, the crux of both courts' reasoning was that withdrawal liability only arises when there is a complete withdrawal under the terms of ERISA, meaning a cessation of the obligation to contribute to the fund or a cessation of operations. *See Basic Am.*, 252 F.3d at 917; *CPT Holdings*, 162 F.3d at 409.[13] In fact, both courts explained that the filing of bankruptcy cannot serve as the point when withdrawal liability arises, because it is conceivable that an employer declares bankruptcy and still manages to meet its obligations to contribute to a pension fund, thereby avoiding withdrawal liability altogether. *See Basic Am.*, 252 F.3d at 917; *CPT Holdings*, 162 F.3d at 409. The Seventh Circuit's view on this issue is evidenced by its reliance on the PBGC Guidance Letter, which clearly states that withdrawal liability is incurred on "the date when the obligation to contribute ceased." PBGC Opinion Letter 87-1, 1987 WL 68403, at *1 (PBGC Jan. 23, 1987); *see also Basic Am.*, 252 F.3d

---

[13] Other courts have ruled consistent with the Sixth Circuit. For instance, *In the Matter of United Merchants & Manufacturers, Inc.*, the court held that "[w]ithdrawal liability requires both an unfunded vested benefit amount and a withdrawal. Only a withdrawal can trigger the contingent right to payment for withdrawal liability. It is this withdrawal that first creates the legal relationship which gives rise to the asserted right to payment." 166 B.R. at 241.

at 917. Accordingly, the Court does not consider the Sixth Circuit's position to be contrary to that of the Seventh Circuit.

The Court recognizes that there is no binding Seventh Circuit authority that provides a clear answer to apply in this case. However, the Court finds the Sixth Circuit's analysis in *CPT Holdings* persuasive, as it is more closely aligned with the reasoning of the Seventh Circuit in *Basic American*. The approach taken by the Third Circuit—to divide the withdrawal liability into pre- and post-petition claims, *see Marcal*, 650 F.3d at 317—is incompatible with the language of the Plan. It also conflicts with the clear instruction of the Seventh Circuit that withdrawal liability is not triggered until the obligation to contribute to the fund has ceased. *See Basic Am.*, 252 F.3d at 917. Also, the Second Circuit's decision in *McFarlin's* did not grapple with the relevant legal issue as directly as the Sixth Circuit in *CPT Holdings*. Thus, the Court will apply the analytical framework of *CPT Holdings* in the instant case.

Here, NRF argues that the sale of Hotel 71 triggered a complete withdrawal because even though the CBA was expressly assigned to the purchaser of Hotel 71, the sale itself failed to satisfy certain requirements laid out in Section 4204(a) of ERISA. (R. 73, Def.'s Resp. at 3 (citing 29 U.S.C. §§ 1383-1384).) The sale closed in July 2008, nearly 10 months after Chicago H&S filed its Chapter 11 petition. (R. 72, Def.'s Rule 56.1 Resp. ¶¶ 23, 31.) According to the principles set forth in *CPT Holdings* and *Basic American*, NRF's withdrawal liability claim arose in July 2008, which would render NRF's withdrawal liability claim a post-petition claim. The plain language of the carve-out provision expressly states that only pre-petition claims are carved

24

out of Section 13.1's release. Therefore, Section 13.1 cannot exempt NRF's withdrawal liability claims from the Plan's release.[14]


### III.    Whether the release is enforceable as a matter of law

#### A.    Whether the release violates the Seventh Circuit's holding in *Airadigm*

NRF argues that even if the Plan releases their claims against Plaintiffs, the release is unenforceable under the Seventh Circuit's holding in *Airadigm*. (R. 73, Def.'s Resp. at 11 (citing 519 F.3d at 657).) Plaintiffs argue that the Plan's release meets all of the requirements set forth in *Airadigm*. (R. 70, Pls.' Mem. at 11.)

In *Airadigm*, one of the central issues the court addressed was "whether Congress affirmatively gave the bankruptcy courts the power to release third parties from a creditor's claims without the creditor's consent[.]"[15]  519 F.3d at 657. The court found that bankruptcy courts have "residual authority" stemming from Sections 105(a) and 1123(b)(6) of the Bankruptcy Code "to release third parties from liability to participating creditors if the release is

---

[14]  Plaintiffs offer additional arguments as to why the carve-out provision does not apply to NRF's claims. Plaintiffs argue that the carve-out provision does not apply because NRF's claims are neither "direct claims" nor are they against "third parties[.]" (R. 70, Pls.' Mem. at 9-10; R. 76, Pls.' Reply at 7-8.) Because the Court views the classification of the claims as either "pre-petition" or "post-petition" as dispositive of whether the carve-out provision applies, the Court need not address these additional arguments.

[15]  Prior to addressing this question, the *Airadigm* court addressed the related question of whether Section 524(e) of the Bankruptcy Code bars a bankruptcy court from releasing non-debtors from liability to a creditor without the creditor's consent. *See* 519 F.3d at 656. Section 524(e) provides that the "discharge of a debt of the debtor does not affect the liability of another entity on, or the property of any other entity for, such debt." *Id.* (quoting 11 U.S.C. § 524(e)). After analyzing conflicting case law from other circuits on the issue, the court ultimately determined that "[Section] 524(e) does not bar a non-consensual third-party release from liability." *Id.*

25

'appropriate' and not inconsistent with any provision of the bankruptcy code." *Id.* In order to meet this requirement, the court asked whether the release was narrowly tailored and essential to the reorganization plan as a whole. *Id.* The court explained that "whether a release is 'appropriate' for the reorganization is fact intensive and depends on the nature of the reorganization." *Id.* For the release at issue in *Airadigm*, the court first determined that the limitation itself was narrow, in that it applied only to claims "arising out of or in connection with" the reorganization itself and did not amount to "'blanket immunity' for all times, all transgressions, and all omissions"; and also that there was "adequate" evidence that the third party would not have participated without the release, and its participation was "essential" to the plan's success. *Id.* The Seventh Circuit has "preached caution" in approving non-debtor releases, finding that "[i]n most instances, [non-debtor] releases . . . will not pass muster under [the *Airadigm*] rule." *In re Ingersoll, Inc.*, 562 F.3d 856, 864-65 (7th Cir. 2009)

Applying those factors here, the parties do not directly dispute that the release was narrowly tailored. Similar to the release in *Airadigm*, Section 13.1 is limited to claims arising in connection with the bankruptcy case, and therefore creditors may still sue Plaintiffs for any claims that are unrelated to Chicago H&S's bankruptcy. Because the release is limited to claims arising from the bankruptcy case, it does not provide "'blanket immunity' for all times, all transgressions, and all omissions" and is unlikely to "affect matters beyond the jurisdiction of the bankruptcy court or unrelated to the reorganization itself." *Airadigm*, 519 F.3d at 657. Although the release does not carve out claims arising from "willful misconduct" as the release in *Airadigm* did, the Court notes that the release in *Ingersoll*—a leading Seventh Circuit case interpreting *Airadigm*—did not expressly mention "willful misconduct" and yet it was still approved by the court. The *Ingersoll* court found the release to be sufficiently narrow because it

was limited to claims arising from the underlying bankruptcy cases, and therefore was "far from a full-fledged bankruptcy discharge arranged without a filing and without the safeguards of the [Bankruptcy] Code." *Ingersoll*, 562 F.3d at 865 (internal quotation marks omitted); *cf. In re Berwick Black Cattle Co.*, 394 B.R. 448, 457 (Bankr. C.D. Ill. 2008) (finding a bankruptcy plan release provision improper because it released pre-petition claims and claims that were unrelated to the bankruptcy case). In addition, claims arising from the alleged misconduct of the hotel's former owners were expressly carved out as pre-petition claims in Section 13.1. Therefore, the Court finds that the release is narrowly tailored.

The parties dispute whether the release was essential to the reorganization plan. Mezz Lender's claim against Chicago H&S was for over $27 million, and Plaintiffs argue that without voluntarily subordinating its claim to those of other creditors, the sale of Hotel 71 would not have provided any meaningful recovery for general creditors, including NRF. (R. 72, Def.'s Rule 56.1 Resp. ¶ 38; R. 70, Pls. Mem. at 11.) NRF counters that a release of withdrawal liability claims could not have been essential to the reorganization because it is not explicitly mentioned in Section 13.1, and the topic of withdrawal liability never arose during the bankruptcy proceedings. (R. 73, Def.'s Resp. at 11.) Plaintiffs respond that because NRF's predecessors participated in the proceedings and never made mention of withdrawal liability, the plan proponents did not anticipate that NRF would later assert any withdrawal liability claims. (R. 76, Pls.' Reply at 9.) Plaintiffs note that when NRF's predecessor filed its claim for contingent withdrawal liability in February 2008, Chicago H&S's motion to confirm the sale and assign the CBA had been pending in the bankruptcy court for many months; NRF's predecessors never mentioned during the proceedings that the sale could potentially trigger withdrawal liability. (*Id.*) Plaintiffs also argue that NRF's withdrawal liability claims did not arise until

27

months after the proceedings when the sale of Hotel 71 closed, and that it would have been "nonsensical" to provide for the specific release of claims that had not yet arisen. (R. 76, Pls.' Reply at 9.)

This Court will not speculate as to the motives behind the decision of NRF's predecessor to remain silent on this issue during the bankruptcy proceedings. The Court also need not pass judgment upon the wisdom of failing to specifically provide for the release of withdrawal liability claims in the Plan, given that NRF's predecessors filed a proof of claim alleging potential withdrawal liability in February 2008, more than a month before the Plan was confirmed. The Court need only determine whether the release was essential to the reorganization, a determination the Seventh Circuit has described as "fact intensive." *See Airadigm*, 519 F.3d at 657.

In both *Airadigm* and *Ingersoll*, the courts looked to findings made by the bankruptcy court to determine whether the release was essential to the plan. *See id.* at 658; *Ingersoll*, 562 F.3d at 865. In Judge Wedoff's Order confirming the Plan, he found that "the release and injunction provisions contained in the Plan are reasonable, necessary and appropriate to resolve the matters raised by this case, comport with the requirements of due process and are within the Court's jurisdiction to approve." (R. 72-1, Ex. 3, Order at 8.) Judge Wedoff's oral findings delivered at the close of the proceedings reiterated this point in great detail. (R. 72-1, Ex. 9, Bankr. Hr'g Tr. at 98:17-99:01.) Judge Wedoff also specifically stated that the release was in conformity with *Airadigm*. (*Id.* at 98:19-21.) After reviewing the record, the Court agrees with the Bankruptcy Court's findings.

As a practical matter, the Court finds the Plaintiffs' observations regarding the necessity of the subordination of their claim persuasive. The going- concern sale of Hotel 71 was central

28

to the success of Chicago H&S's reorganization, and the distributions creditors received from the proceeds of the sale would have been severely compromised if Plaintiffs' $27 million claim had received priority over other creditors. Further, Judge Wedoff viewed the release as "exculpatory" for Plaintiffs and other releasees to protect them against claims arising in connection with the bankruptcy case. (*See* R. 72-1, Ex. 7, Bankr. Hr'g Tr. at 18:11-25, 25:22-24; R. 72-1, Ex. 9, Bankr. Hr'g Tr. at 90:23-91:05, 98:17-99:01.) Therefore, aided by the findings of the Bankruptcy Court, this Court concludes that the release was "essential" to the plan.

While NRF may dispute this finding, it has pointed to nothing in the record to contradict this material fact. *See Carroll*, 698 F.3d at 564. NRF's observation that withdrawal liability was never mentioned during the proceedings, while factually true, simply does not negate that the release was essential to the plan. The Bankruptcy Court plainly stated this fact, and the Court has been provided with no basis to conclude otherwise. NRF's implied argument is that the Plan could not have released their withdrawal liability claims unless it specifically did so in the text of Section 13.1. However, as described above, the plain language of Section 13.1 releases *any* and *all claims* arising in connection with the bankruptcy case. (R. 71-5, Ex. 5, Plan § 13.1.) This would include the withdrawal liability claims, regardless of whether they were mentioned specifically during the proceedings or set forth by name in the Plan. *See In re FFS Data, Inc.*, 776 F.3d 1299, 1309 (11th Cir. 2015) (a general release of "all claims" need not specify which claims it is releasing) (citation omitted)). The fact that the withdrawal liability claims arose post-petition further illustrate why the claims were not expressly mentioned in the Plan. The Court recognizes that the Bankruptcy Court did not specifically state that the release of withdrawal liability claims were integral to the Plan's success, as NRF apparently believes is necessary for Plaintiffs to prevail on this point. (*See* R. 73, Def.'s Resp. at 11.) But again, withdrawal liability

had neither been mentioned during the proceedings nor incurred by Chicago H&S at that point, and thus it would have made no sense for the Bankruptcy Court to issue such a detailed finding. Judge Wedoff's finding in this case is similar to the findings issued by the bankruptcy court in *Ingersoll*, which the Seventh Circuit deemed sufficient to ensure that the release was indeed "essential" to the reorganization plan. *See* 562 F.3d 864-65. Therefore, the Court is confident that the record contains sufficient evidence to demonstrate that the release was essential to the plan's success.[16] Consequently, NRF has failed to "provide evidence of specific facts creating a genuine dispute." *See Carroll*, 698 F.3d at 564.

## B. Whether the release violates the Bankruptcy Code & ERISA

NRF also argues that the release is unenforceable under both the Bankruptcy Code and ERISA. (R. 73, Def.'s Resp. at 12-14.) Plaintiffs counter that these arguments are an impermissible collateral attack on the Order, and therefore should not be addressed. (R. 76, Pls.' Reply at 11-12.)

As an initial matter, the Court has already provided an answer to NRF's argument regarding the Plan's enforceability under the Bankruptcy Code. In both *Airadigm* and *Ingersoll*, the Seventh Circuit made it clear that under Sections 105(a) and 1123(b)(6) of the Code

---

[16] On a related point, the Court notes that the bankruptcy proceeding transcripts show that Mr. Zazove, the attorney representing Plaintiffs and Chicago H&S, stated that the Plan contained "no third-party releases." (R. 75, Pls.' Resp. Add'l Facts ¶¶ 10, 17, 19.) These statements constitute extrinsic evidence, and therefore they were not considered as part of the Court's interpretation of the Plan. *See Thompson*, 948 N.E.2d at 47; *Curia*, 587 F.3d at 829. The Plan's language was clear and unambiguous, and neither party argued to the contrary; thus the Court was not permitted to consider this evidence. However, in context, it is clear that Mr. Zazove's reference to "third parties" meant creditors not involved in the bankruptcy proceedings, particularly creditors whose claims had not been released by Section 13.1. (R. 76, Pls.' Reply at 7-8.) Section 13.1 clearly discusses third-party claims, and carves out only those third-party claims that are pre-petition and "direct" claims. (R. 71-5, Ex. 5, Plan at § 13.1.) Therefore, Mr. Zazove's statements are not evidence that the release did not pertain to *any* third-party claims, and more importantly, these statements do not undermine the Court's finding that the release was essential to the Plan's success.

bankruptcy courts have the power to release third parties from liability in certain limited circumstances. Having already determined that the Plan comports with the requirements set forth in *Airadigm* and *Ingersoll*, the Court concludes that the release in Section 13.1 does not violate the Bankruptcy Code.

Regarding NRF's second argument that the release violates ERISA, the Court recognizes that this is a complex question that has not been directly addressed by the Seventh Circuit in the context of withdrawal liability. However, the Court need not resolve this issue, as the Court agrees with Plaintiffs that NRF may not argue in this appellate proceeding that the Plan is in violation of ERISA.

"As a general rule, the failure to raise an objection at the confirmation hearing or to appeal from the order of confirmation should preclude attack on the plan or any provision therein as illegal in a subsequent proceeding." *Adair v. Sherman*, 230 F.3d 890, 894 (7th Cir. 2000) (quoting *In re Chappell*, 984 F.2d 775, 782 (7th Cir. 1993)). "The law is well settled that a confirmation order is res judicata as to all issues decided or which could have been decided at the hearing on confirmation." *Id.* at 895 (citation omitted); *see also In re UAL Corp.*, 635 F.3d 312, 321 (7th Cir. 2011) ("By failing to object to or appeal the plan's confirmation, [the creditor] lost any opportunity to seek an exemption from or to challenge [a] provision" in the plan.); *In re Rovell*, No. 95 B 21171, 2000 WL 236368, at *5 (Bankr. N.D. Ill. Feb. 17, 2000) ("[S]ection 1141(a) of the Bankruptcy Code bars the relitigation of any issues that were raised or that could have been raised in the confirmation proceedings." (citation omitted)).

Here, counsel for UNITE HERE attended the bankruptcy proceedings but failed to raise an objection to any provision of the Plan. (R. 72, Def.'s Rule 56.1 Resp. ¶ 46; R. 72-1, Ex. 6, Bankr. Hr'g Tr. at 1.) NRF's predecessor, the HEREIU Fund, had already filed a proof of claim

alleging that withdrawal liability may be incurred by Chicago H&S's reorganization; thus counsel was clearly aware that the reorganization plan affected the fund's interests. (R. 72, Def.'s Rule 56.1 Resp. ¶ 47; R. 72-1, Ex. 4, Proof of Claim 94 at 108.) Counsel could have taken a number of actions: requested a modification of the release language, raised a challenge to the legality of the release at the time of the proceedings, or appealed the confirmation order; but instead he chose to do nothing. Unfortunately, the Seventh Circuit has made it clear that the price for doing so is an inability to collaterally attack the confirmation of the Plan. *See Sherman*, 230 F.3d at 894. Therefore, NRF may not challenge the legality of the release before this Court.

## IV. Whether the injunction is enforceable

The Court will briefly address the validity of the Plan's injunction. Neither party discusses the injunction contained in Section 13.4 of the Plan in any depth. In fact, Plaintiffs offer no arguments regarding its validity or enforceability. NRF argues in a footnote that because it believes that the Plan does not release their claims against Plaintiffs, the injunction provision also does not apply to their withdrawal liability claims. (R. 73, Def.'s Resp. at 6, n.4.) Unfortunately, as the preceding analysis makes clear, the Plan does indeed release NRF's claims against Plaintiffs. The plain language of Section 13.4 clearly bars any claim holder from filing any suit for claims that were released in Section 13.1. (R. 71-5, Ex. 5, Plan § 13.4.) Accordingly, based upon the terms of the Plan, NRF is enjoined from asserting its withdrawal liability claims against Plaintiffs. NRF has not asserted any challenges to the enforceability of the injunction, so the Court need not delve into the issue at length. However, the Court reiterates that the Bankruptcy Court specifically found that both the release and injunction were "reasonable, necessary and appropriate to resolve the matters raised by this case, comport with the requirements of due process and are within the Court's jurisdiction to approve." (R. 72-1,

Ex. 3, Order at 8.) Judge Wedoff also found that the injunction comported with *Airadigm*. (R. 72-1, Ex. 9, Bankr. Hr'g Tr. at 98:19-21.) *Cf. In re GAC Storage Lansing, L.L.C.*, 485 B.R. 174, 198 (Bankr. N.D. Ill. 2013) (finding an injunction provision in a bankruptcy plan unenforceable because it was not limited to matters related to bankruptcy, and was therefore "overly broad" and violated *Airadigm* holding.) Consequently, the Court finds that NRF is enjoined from proceeding in its suit against Plaintiffs for withdrawal liability.

Having addressed the entirety of the parties' arguments regarding the release and injunction of NRF's withdrawal liability claims against Plaintiffs, the Court concludes that Plaintiffs have demonstrated that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Jajeh*, 678 F.3d at 566. Accordingly, the Court will grant Plaintiffs the declaration they seek as it pertains to NRF's withdrawal liability claims against them. To the extent that Plaintiffs seek a declaration that NRF's withdrawal liability claims against members of the Controlled Group are released or enjoined, that issue is addressed below.

## V.     Whether NRF's withdrawal liability claims against Controlled Group members were also released and enjoined by the Plan

As a final matter, the Court considers whether the Plan released and enjoined NRF's withdrawal liability claims against members of the Controlled Group. It is unclear on what basis Plaintiffs' assert that the Plan also pertains to members of the Controlled Group. At various points throughout their pleadings, they alternatively assert that: (1) Controlled Group members were also releasees under the Plan, (R. 70, Pls.' Mem. at 9); or (2) only Plaintiffs are releasees, but nonetheless the Plan enjoined claims against Controlled Group members, (R. 69, Pls.' Renewed Mot. Summ. J. at 2; R. 76, Pls.' Reply at 2).

As to Plaintiffs' first argument, the Court notes that the record contains no evidence as to the identities of the other Controlled Group members. Without such critical information, the Court cannot possibly assess at this juncture whether Controlled Group members fall under the Plan's definition of a "releasee" such that Section 13.1 could be interpreted to release claims against them. If other Controlled Group members are not releasees, NRF would be within its rights to pursue claims against them based on their joint and several liability under ERISA. *See Messina Prods.*, 706 F.3d at 878 (citing 29 U.S.C. § 1301(b)(1); *Neiman*, 285 F.3d at 594).

As to Plaintiff's second argument, it appears that they are relying on *Central States, Southeast and Southwest Areas Pension Fund v. Stroh Brewery Co.*, 220 B.R. 959 (N.D. Ill. 1997), for the premise that a reorganization plan's release of a debtor's withdrawal liability may extend to controlled group members. (R. 76, Pls.' Reply at 13.) In *Stroh Brewery*, the Court found that the release and discharge provisions of a bankruptcy plan enjoined a creditor from bringing claims against the debtor's successor-in-interest based upon the debtor's withdrawal liability. 220 B.R. at 963. Plaintiffs' attempt to use this holding to insulate Controlled Group members from liability under ERISA is problematic. Plaintiffs' argument conflates withdrawal liability and successor liability. While the plan in *Stroh Brewery* may have protected the debtor's successor, it does not necessarily follow that the discharge and release provisions would extend to members of the debtor's controlled group, as they are jointly and severally liable. *See Messina Prods.*, 706 F.3d at 878 (citation omitted). The court declined to address whether the release and discharge applied to third-party non-debtors, calling the issue "inconsequential" to its analysis. 220 B.R. at 963. Instead, the court based its release of the successor on the provisions of the plan. *Id.* Therefore, Plaintiffs' second argument is unavailing as well.

In summary, Plaintiffs have failed to demonstrate that they are entitled to summary judgment on this issue. Due to the lack of information regarding the identities of the Controlled Group members, it is far from well-settled that there are no disputes of material fact and that Plaintiffs are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Jajeh*, 678 F.3d at 566. Accordingly, the Court cannot issue Plaintiffs their requested declaration that the Plan releases and enjoins NRF's withdrawal liability claims against Controlled Group members. As a result, Plaintiffs' motion for summary judgment is denied in part and granted in part.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (R. 69) is GRANTED IN PART and DENIED IN PART. The Court concludes that Section 13.1 of the Plan releases claims against Plaintiffs for any claim for withdrawal liability in connection with Chicago H&S's dissolution, and therefore NRF is enjoined from pursuing its withdrawal liability claims against Plaintiffs. The parties shall appear in court for a status hearing on September 30, 2015 at 9:45 a.m. to determine what issues, if any, remain in this litigation.

**ENTERED:**

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: August 21, 2015**

35